Mario L. SHANNON and Sheena Evans Shannon, individually and as co-administrators of the Estate Of Evan Jon Shannon, Appellants,

v.

Larry P. McNULTY, M.D., and Heathamerica Pennsylvania, Inc., Appellees.

Superior Court of Pennsylvania.

Argued Jan. 29, 1998.

Filed Oct. 5, 1998.

David J. Lozier, Pittsburgh, for appellants.

Larry A. Silverman, Pittsburgh, for HealthAmerica, appellee.

Before DEL SOLE, HUDOCK and ORIE MELVIN, JJ.

ORIE MELVIN, Judge:

Mario L. Shannon and his wife, Sheena Evans Shannon, in their own right and as co-administrators of the Estate of Evan Jon Shannon, appeal from an order entered in the Court of Common Pleas of Allegheny County denying their motion to remove a compulsory nonsuit. This appeal concerns the Shannons' claims of vicarious and corporate liability against HealthAmerica stemming from the premature delivery and subsequent death of their son. We reverse the order refusing to remove the compulsory nonsuit and remand for trial.

This medical malpractice action arises from the pre-natal care provided by appellees, Larry P. McNulty, M.D. and HealthAmerica, to Mrs. Shannon. The Shannons claimed Dr. McNulty was negligent for failing to timely diagnose and treat signs of pre-term labor, and HealthAmerica was vicariously liable for the negligence of its nursing staff in failing to respond to Mrs. Shannon's complaints by timely referring her to an appropriate physician or hospital for diagnosis and treatment of her pre-term labor. The Shannons also alleged HealthAmerica was corporately liable for its negligent supervision of Dr. McNulty's care and its lack of appropriate procedures and protocols when dispensing telephonic medical advice to subscribers.

The case went to trial before a jury, and at the close of the plaintiffs' case HealthAmerica moved for a compulsory nonsuit.[1] The trial court denied the motion. HealthAmerica then proceeded to put on its case by calling two of its triage nurses. At the conclusion of the testimony of the second nurse the court recessed for the day. The following morning the court, *sua sponte*, reconsidered HealthAmerica's motion for compulsory nonsuit, entertained argument thereon, and granted the nonsuit.[2] The Shannons filed timely post trial motions seeking to have the nonsuit removed. After denial of such motions, this appeal followed.

On appeal the Shannons present two questions for this Court to review:

1. [DID] THE TRIAL COURT [ERR] IN GRANTING A COMPULSORY NONSUIT IN FAVOR OF [APPELLEE], HEALTHAMERICA, AND AGAINST THE [APPELLANTS] [IN THAT APPELLANTS] MADE OUT A PRIMA FACIE CASE AGAINST HEALTHAMERICA FOR BOTH COMMON LAW VICARIOUS LIABILITY REGARDING THE ACTIONS OF HEALTHAMERICA'S TRIAGE NURSES AND EMPLOYEES, AND DIRECT CORPORATE LIABILITY.

2. [DID] THE TRIAL COURT [ERR] IN GRANTING A COMPULSORY NONSUIT AFTER [APPELLEE] HEALTHAMERICA PRESENTED EVIDENCE IN ITS CASE IN CHIEF.

(Appellants' Brief at 2). Initially, we note that the scope of review in an appeal from the denial of a motion to remove a compulsory nonsuit is limited to determining whether the trial court abused its discretion or committed an error of law. *Brindle v. West Allegheny Hosp.*, 406 Pa.Super. 572, 594 A.2d 766 (Pa.Super.1991). Our standard of review regarding the propriety of an entry of a compulsory nonsuit is well settled:

[I]t is proper only if the fact finder, viewing all of the evidence in favor of the plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established. When a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. A compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established and the plaintiff must be given the benefit of all favorable evidence along with all reasonable inferences of fact arising from that evidence, resolving any conflict in favor of the plaintiff. The fact-finder,

---

1. On the eve of trial the Shannons entered into a settlement agreement with Dr. McNulty.

2. The court also directed a verdict, as to liability only, against Dr. McNulty consistent with the out of court settlement. The directing of this verdict has not been raised as an issue in this appeal.

however, cannot be permitted to reach a decision on the basis of speculation or conjecture.

*Smith v. Grab*, 705 A.2d 894 (Pa.Super.1997) (citations omitted) *quoting Joyce v. Boulevard Physical Therapy and Rehab. Center*, 694 A.2d 648, 652–53 (Pa.Super.1997).

Since the issues raised are interrelated we will address the procedural challenge first. The Shannons correctly argue that Pa. R.C.P. 230.1 specifically mandates that a trial court may only enter a nonsuit "before any evidence on behalf of the defendant has been introduced." The reason for this proscription is clear, once any evidence in defense of a claim is admitted the trial judge's ability to only consider the strength of the plaintiff's case is compromised. The Shannons argue for a strict interpretation of this rule in accordance with *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (Pa.1978).

In *Atlantic Richfield*, our supreme court had occasion to interpret the statutory predecessor [3] to Pa. R.C.P. 230.1 and opined:

> To assure that the trial court considers the motion only on the basis of evidence favorable to the plaintiff, the Act expressly limits the court's authority to grant a nonsuit to those instances where a defendant has 'offer[ed] no evidence.' Our cases have strictly enforced the terms of the Act, prohibiting the trial court from granting the motion where the defendant offers evidence either during the plaintiff's case, or after it. We have even held that where the defendant exceeds proper bounds of cross-examination so as to elicit matters constituting a defense to the cause of action, the trial court is without authority to enter a nonsuit.

*Id.* at 744. (citations omitted). Conversely, HealthAmerica argues that even if there was a procedural error, such error was harmless because the Shannons failed to present sufficient evidence to establish a *prima facie* case of medical malpractice. A review of caselaw reveals conflicting appellate decisions concerning the applicability of the harmless error doctrine.

In *Robinson v. City of Philadelphia*, 149 Pa.Cmwlth. 163, 612 A.2d 630 (Pa.Cmwlth. 1992), the trial court granted a nonsuit after the defendant offered evidence of a defense through the cross-examination of one of the plaintiff's witnesses. On appeal to the Commonwealth Court, the defendant therein also maintained that the timing of the nonsuit was harmless error since the plaintiff had failed to meet her burden of proof with regard to liability. The *Robinson* court disagreed with this argument and held:

> The [defendant's] interpretation of Rule 230.1 and of *Atlantic Richfield* is flawed because it ignores that portion of the rule regarding its presentation of evidence and would render that language superfluous. After the [defendant] presented evidence, the question of whether [plaintiff] established a right to relief is irrelevant. Regardless of what [plaintiff] proved or failed to prove, the fact remains that the [defendant] presented evidence constituting a defense to [plaintiff's] cause of action. After allowing this testimony, the trial court was expressly prohibited by Rule 230.1 from entering a nonsuit in this case.

*Id.*, at 633.

In *Storm v. Golden*, 371 Pa.Super. 368, 538 A.2d 61 (Pa.Super.1988), the trial court granted a compulsory nonsuit after the defense had admitted exhibits during the plaintiff's case. On appeal, this Court interpreted *Atlantic Richfield, supra*, as permitting a harmless error analysis and concluded that:

> [A]ppellant's failure to produce an expert witness as to the standard of care under which appellee should have conducted himself and as to any deviation from that standard that may have occurred makes appellant's case defective as a matter of law and the procedurally improper entry of a nonsuit harmless error.

*Storm*, at 65. Likewise, in *Kratt v. Horrow*, 455 Pa.Super. 140, 687 A.2d 830 (Pa.Super.1996), the defendant offered a defense expert after the plaintiff's case-in-chief and then moved for a compulsory nonsuit. The nonsuit was initially granted but subsequent-

---

**3.** Act of March 11, 1875, P.L. 6, § 1, as amended, 12 P.S. § 645, repealed by Act of April 28, 1978, P.L. 202, No. 53, § 1, effective June 27, 1980.

ly removed by the trial judge because he believed he had violated Rule 230.1. On appeal we stated:

> The express language of Pa. R.Civ.P. 230.1 and the above cited authorities compel us to conclude that the trial court was not empowered to enter the initial nonsuit because the appellant had offered evidence. Nonetheless, even though it was procedurally improper for the trial court to enter a nonsuit, we find that as a matter of law the error was harmless. We reach this determination upon review of the evidence which discloses that the trial court did not take [the expert's] testimony into consideration in disposing of the nonsuit motion.

*Id.*, at 831. Here, as in *Kratt*, the trial court offers the same reasoning. *See* Trial Court Opinion dated July 2, 1997 at page 4. Given these divergent views and the absence of specific guidance from our supreme court on this issue, we feel constrained to follow the approach in *Storm* and *Kratt*, *supra*, thereby permitting a harmless error analysis. Accordingly, we must now examine the record in the light most favorable to the appellants to determine if they introduced sufficient evidence to establish a *prima facie* case against HealthAmerica based upon a theory of either vicarious or corporate liability.[4]

▆▆▆▆ Generally, in a medical malpractice case the plaintiff must establish: (1) a duty owed by the health care provider to the patient; (2) a breach of that duty; (3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) damages suffered by the patient that were a direct result of that harm. *Nogowski v. Alemo–Hammad*, 456 Pa.Super. 750, 691 A.2d 950, 956 (Pa.Super.1997). Moreover, except where it is obvious, the plaintiff must present expert testimony that the health care provider's conduct deviated from an accepted standard of care and such deviation was the proximate cause of the harm suffered. *Id.*

The theory of corporate liability as it relates to hospitals was first adopted in this Commonwealth in the case of *Thompson v.*

*Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (Pa.1991). Our supreme court upheld a direct theory of liability against the hospital, stating:

> Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

*Id.* at 707. (footnote omitted) The court then set forth four general areas of corporate liability:

> (1) A duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;
>
> (2) A duty to select and retain only competent physicians;
>
> (3) A duty to oversee all persons who practice medicine within its walls as to patient care;
>
> (4) A duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

*Id.* The court further stated that "we adopt as a theory of hospital liability the doctrine of corporate negligence or corporate liability under which the hospital is liable if it fails to uphold the proper standard of care owed its patient." *Id.* at 708.

The evidence introduced by the Shannons may be summarized in relevant part as follows. Mrs. Shannon testified during the trial of this case that she was a subscriber of the HealthAmerica HMO when this child was conceived. It was Mrs. Shannon's first pregnancy. When she advised HealthAmerica she was pregnant in June 1992, they gave her a list of six doctors from which she could select an OB/GYN. She chose Dr. McNulty from the list. (N.T. at 273–275) Her HealthAmerica membership card instructed her to contact either her physician or HealthAmerica in the event she had any medical ques-

---

4. HealthAmerica also claims that any error in the timing of the court's grant of the nonsuit was waived by the appellants' failure to specifically object to the timing of the order. Since this appeal is being resolved on substantive grounds this argument is moot.

tions or emergent medical conditions. The card contained the HealthAmerica emergency phone number, which was manned by registered nurses. (N.T. at 276–277) She testified it was confusing trying to figure out when to call Dr. McNulty and when to call HealthAmerica because she was receiving treatment from both for various medical conditions related to her pregnancy, including asthma and reflux. (N.T. at 278–279, 303).

She saw Dr. McNulty monthly but also called the HealthAmerica phone line a number of times for advice and to schedule appointments with their in-house doctors. (N.T. at 279–280) She called Dr. McNulty on October 2, 1992 with complaints of abdominal pain. The doctor saw her on October 5, 1992 and examined her for five minutes. He told Mrs. Shannon her abdominal pain was the result of a fibroid uterus, he prescribed rest and took her off of work for one week. He did no testing to confirm his diagnosis and did not advise her of the symptoms of pre-term labor. (N.T. at 281–283)

She next called Dr. McNulty's office twice on October 7 and again on October 8 and October 9, 1992, because her abdominal pain was continuing, she had back pain, was constipated and she could not sleep. She asked Dr. McNulty during the October 8th call if she could be in pre-term labor because her symptoms were similar to those described in a reference book she had on labor. (N.T. at 283–285) She told Dr. McNulty her pains were irregular and about ten minutes apart, but she had never been in labor so she did not know what it felt like. He told her he had just checked her on October 5th, and she was not in labor. (N.T. at 285–286) The October 9th call was at least her fourth call to Dr. McNulty about her abdominal pain, and she testified that Dr. McNulty was becoming impatient with her. *Id.*

On October 10th, she called HealthAmerica's emergency phone line and told them about her severe irregular abdominal pain, back pain, that her pain was worse at night, that she thought she may be in pre-term labor, and about her prior calls to Dr. McNulty. The triage nurse advised her to call Dr. McNulty again. (N.T. at 286–287) Mrs. Shannon did not immediately call Dr.

McNulty because she did not feel there was anything new she could tell him to get him to pay attention to her condition. She called the HealthAmerica triage line again on October 11, 1992, said her symptoms were getting worse and Dr. McNulty was not responding. The triage nurse again advised her to call Dr. McNulty. (N.T. at 288–289) Mrs. Shannon called Dr. McNulty and told him about her worsening symptoms, her legs beginning to go numb, and she thought that she was in pre-term labor. He was again short with her and angry and insisted that she was not in pre-term labor. (N.T. at 289–290)

On October 12, 1992, she again called the HealthAmerica phone service and told the nurse about her symptoms, severe back pain and back spasms, legs going numb, more regular abdominal pain, and Dr. McNulty was not responding to her complaints. One of HealthAmerica's in-house orthopedic physicians spoke with her on the phone and directed her to go to West Penn Hospital to get her back examined. (N.T. at 290–292) She followed the doctor's advice and drove an hour from her house to West Penn, passing three hospitals on the way. At West Penn she was processed as having a back complaint because those were HealthAmerica's instructions, but she was taken to the obstetrics wing as a formality because she was over five (5) months pregnant. She delivered a one and one-half pound baby that night. He survived only two days and then died due to his severe prematurity. (N.T. at 293–296).

The Shannons' expert, Stanley M. Warner, M.D., testified he had experience in a setting where patients would call triage nurses. Dr. Warner opined that HealthAmerica, through its triage nurses, deviated from the standard of care following the phone calls to the triage line on October 10, 11 and 12, 1992, by not immediately referring Mrs. Shannon to a physician or hospital for a cervical exam and fetal stress test. As with Dr. McNulty, these precautions would have led to her labor being detected and increased the baby's chance of survival. (N.T. 146–147, 158–156) Dr. Warner further testified on cross examination that Mrs. Shannon turned to HealthAmerica's triage nurses for medical advice on these three occasions when she communicated her

symptoms. She did not receive appropriate advice, and further, if HealthAmerica's triage nurses intended for the referrals back to Dr. McNulty to be their solution, they had a duty to follow up Mrs. Shannon's calls by calling Dr. McNulty to insure Mrs. Shannon was actually receiving the proper care from him. (*Id.*233–35).

## CORPORATE LIABILITY

In granting the nonsuit the trial court concluded the Shannons failed to present sufficient evidence to establish negligence on the part of HealthAmerica under either a corporate or vicarious liability theory. After first questioning the applicability of corporate liability to an HMO such as HealthAmerica, the trial court offered the following rationale with respect to the inadequacy of the evidence of corporate negligence:

> First, only two of the four duties set forth in *Thompson, supra,* could conceivably apply to a health maintenance organization such as HealthAmerica.... There was no discussion, for example, of how HealthAmerica selected participating physicians or the criteria used in monitoring the physicians' performance. Similarly, Plaintiffs produced no evidence regarding the formulation, adoption or enforcement of rules or policies by HealthAmerica in carrying out its duty to provide adequate care to its subscribers. In the absence of such evidence, it is apparent that Plaintiffs failed to meet their burden of establishing the necessary elements to maintain a cause of action for corporate negligence, thereby justifying the granting of a compulsory nonsuit.

(Trial Court Opinion dated July 2, 1997 at pages 6–7). Without addressing the trial court's conclusion that a lack of evidence regarding the formulation, adoption or enforcement of rules or policies by HealthAmerica defeats the Shannons' claim of corporate negligence, we find the third duty is applicable. In assessing whether the Shannons evidence was sufficient to allow the case to go the jury on the theory of corporate liability pursuant to this third duty, we find *Welsh v. Bulger,* 548 Pa. 504, 698 A.2d 581 (Pa.1997) to be instructive.

In *Welsh*, the Supreme Court of Pennsylvania addressed the issue of what type of evidence was necessary to establish a *prima facie* claim of corporate negligence against a hospital pursuant to *Thompson v. Nason Hospital, supra.* Ms. Welsh alleged Nason Hospital was vicariously liable for the negligent acts of its staff in failing to monitor and respond to an infant showing signs of fetal distress. Additionally, she alleged Nason Hospital was directly liable for its own negligence because it granted nonsurgical obstetrical privileges to Dr. Bulger without requiring a qualified surgeon to be available in case surgery was necessary and because its staff failed to notify the hospital that Welsh's child needed a surgical delivery.

In support of her claims, Ms. Welsh relied on the expert report of Dr. Stanley M. Warner, the same expert as in the present case. Applying the third duty under *Thompson, supra,* the *Welsh* Court reviewed Dr. Warner's report and stated:

> Read in the light most favorable to Welsh as the non-moving party, the report shows that Dr. Warner opined that the nurses breached the standard of care because they must have known that there was a problem with the delivery but failed to act on that knowledge. Dr. Warner concluded that this breach was a substantial factor in bringing about the harm to the deceased when he concluded that if the nurses had notified the hospital of the need for a cesarean section, then the injury would not have occurred. Thus, Dr. Warner's report is sufficient to support a *prima facie* claim of corporate negligence for Nason Hospital's failure to oversee all persons who practice medicine within its walls as to patient care.

*Welsh,* at 586.

The *Welsh* Court also considered claims under the second and fourth duties of *Thompson* and opined:

> Dr. Warner's report indicates that the hospital breached the standard of care by not arranging for a qualified surgeon to perform a cesarean section. Dr. Warner also opined that the hospital's failure to arrange for a cesarean section was a sub-

stantial factor in causing the harm to the deceased because if 'the hospital had arranged for an appropriate cesarean section with the nurses' input on this, there is every reason to believe that [the infant] would be an absolutely normal child today.' Therefore, Dr. Warner's report is sufficient to establish a *prima facie* claim of corporate negligence against the hospital for failure to retain only competent physicians and for failure to formulate and enforce policies to ensure quality care.

*Id.*

Similarly, in the present case Dr. Warner, on direct examination, offered the following opinion when asked whether or not HealthAmerica deviated from the standard of care:

I believe they did deviate from the standard of care. I believe on each occasion of the calls on October 10th, 11th, and October 12th, that Mrs. Shannon should have been referred to the hospital, and the hospital notified that this woman was probably in preterm labor and needed to be handled immediately. They did have the alternative of calling for a physician, if they wanted to, for him to agree with it, but basically she needed to be evaluated in a placd [sic] where there was a fetal monitor and somebody to do a pelvic examination to see what was happening with her.

(N.T. dated October 2, 1996 at page 146). When asked whether this deviation increased the risk of harm Dr. Warner stated that "it did increase the risk of harm to the baby, and definitely decreased the chance of [the baby] being born healthy." *Id.*, at 147.

Dr. Warner further testified in response to a series of hypothetical questions as follows:

Q. I want you to assume that on Saturday, October 10th, that Mrs. Shannon calls Health America and she talks to a triage nurse, and she relates to the triage nurse she is experiencing severe abdominal pain. I want you to assume that she is told, the triage nurse who answered the phone, that she has related these symptoms to Dr. McNulty, and she related Dr. McNulty's response, or lack of response, to her complaints of abdominal pain. I want you to assume that the triage nurse's advice is simply to call the doctor back again. Now, under those facts do you have an opinion,

within a reasonable degree medical certainty, whether or not Health America deviated from the standard of care?

A. I do.

Q. What is that opinion?

A. I believe they deviated from the standard of care, the nurse.

Q. We're talking now with respect to October 10th.

A. Yes, sir. The nurse at that time would have a responsibility to know these are signs and symptoms of preterm labor, and to make sure she gets care in a facility where the ability to have fetal monitoring and cervix examination are. She should call up Dr. McNulty and ask him to make arrangments [sic] for that, or she can send the patient directly to the hospital. She should, in any event, make sure that happens in a very timely fashion. In other words, do it right away, you don't delay in doing this. You want to get her there before it's too late, before the cervix dilates too far, before it's too late to inhibit labor.

* * * *

Q. I want you to assume, Dr. Warner, that on October 11, 1992, Mrs. Shannon called Health America again, and again relayed her complaints of either abdominal pain, back pain or side pain. Once again she also relayed her history of what I just told you, and she relayed what Dr. McNulty had done and what he hadn't done up to October 11th, and that the advice from Health America was the same, call Dr. McNulty back again. Now, under that factual scenario do you have an opinion, within a reasonable degree of medical certainty, whether or not Health America deviate from the standard of care on October 11, 1992?

A. I do have an opinion.

Q. And what is that?

A. That they deviated from the standard of care on October 11, 1992, as well. This woman was obviously searching for help. She was worried, and nobody was responding to her. She needed to be brought into the hospital and monitored and examined, and Dr. McNulty did not provide for it. She tlaked [sic] to Health America, who is one of her medical providers, and they at least had to get her into the hospital on an

emergency condition, seen right away and monitored and examined right away, and if they called ahead to the emergency room to let them know that, then the emergency room is conditioned to respond, they know they have to respond rapidly to this preterm labor situation before they lose the chance to stop the labor.

Q. Moving down to October 12th, I want you to assume that Sheena Shannon called Health America on October 12, 1992, and relayed the same history. That is, the history now of back pain. I want you to assume that the nurse at Health America asked Sheena whether or not she had experienced any type of trauma over the course of the past year. Although she was also informed of her pregnancy and her gestational status, the nurse under this assumption was told that she had been in two automobile accidents, and the triage nurse then called an internist. The internist under this assumption called Sheena and told Sheena to go to the hospital, West Penn Hospital, for an orthopedic consult. I want you also to assume under this scenario that no provision was made by Health America to this hospital. Now, under that scenario did Health America deviate from the standard of care?

A. Yes, they did deviate from the standard of care. Again she should have been sent to the emergency room right away, and the emergency room notified there was a possibility that she was in preterm labor, regardless of the fact she had prior car accidents. Once again, you can't differentiate back pain caused by preterm labor from other sources of back pain without going through a Physical examination and measurments [sic] that you need to determine whether or not she was in labor or not. So, she had to go in and be seen right away. Her call was at 12:42, as I understand, or about 12:30, I think I saw in one place.

Q. That's right, 12:42.

A. And she was five centimeters at 4:00 a.m., approximately. Since the first part of labor moves rather slowly, expecially in a first baby, an hour or two could have made a significant difference. There's a good probability that if they had seen her at 2:00 a.m. she would still be at four

centimeters or less, and they could have inhibited labor even on that night if they had gotten her in quickly enough.

*Id.* at 158–162.

Viewing the evidence in the light most favorable to the Shannons as the non-moving party, our examination of the instant record leads us to the conclusion that the Shannons presented sufficient evidence to establish a *prima facie* case of corporate liability pursuant to the third duty set forth in *Thompson, supra.* However, due to the different entities involved, this determination does not end our inquiry. The *Welsh* case involved a suit against a hospital and thus *Thompson* was clearly applicable. Instantly, HealthAmerica, noting this Court's decision not to extend corporate liability under the facts in *McClellan v. Health Maintenance Organization of Pennsylvania,* 413 Pa.Super. 128, 604 A.2d 1053 (Pa.Super.1992), argues that the *Thompson* duties are inapplicable to a health maintenance organization. We disagree.

■ In adopting the doctrine of corporate liability the *Thompson* court recognized "the corporate hospital's role in the total health care of its patients." *Thompson,* at 708. Likewise, we recognize the central role played by HMOs in the total health care of its subscribers. A great deal of today's healthcare is channeled through HMOs with the subscribers being given little or no say so in the stewardship of their care. Specifically, while these providers do not practice medicine, they do involve themselves daily in decisions affecting their subscriber's medical care. These decisions may, among others, limit the length of hospital stays, restrict the use of specialists, prohibit or limit post hospital care, restrict access to therapy, or prevent rendering of emergency room care. While all of these efforts are for the laudatory purpose of containing health care costs, when decisions are made to limit a subscriber's access to treatment, that decision must pass the test of medical reasonableness. To hold otherwise would be to deny the true effect of the provider's actions, namely, dictating and directing the subscriber's medical care.

Where the HMO is providing health care services rather than merely providing money to pay for services their conduct should be

subject to scrutiny. We see no reason why the duties applicable to hospitals should not be equally applied to an HMO when that HMO is performing the same or similar functions as a hospital. When a benefits provider, be it an insurer or a managed care organization, interjects itself into the rendering of medical decisions affecting a subscriber's care it must do so in a medically reasonable manner. Here, HealthAmerica provided a phone service for emergent care staffed by triage nurses. Hence, it was under a duty to oversee that the dispensing of advice by those nurses would be performed in a medically reasonable manner. Accordingly, we now make explicit that which was implicit in *McClellan* and find that HMOs may, under the right circumstances, be held corporately liable for a breach of any of the *Thompson* duties which causes harm to its subscribers.

## VICARIOUS LIABILITY

The Shannons also maintain that their evidence was sufficient to establish the vicarious liability of HealthAmerica for the negligent rendering of services by its triage nurses in accordance with Section 323 of the Restatement (Second) of Torts. We agree.

Resolution of this contention is controlled by our holding in *McClellan, supra,* where we found that the HMO involved in that case had a non-delegable duty to select and retain only competent primary care physicians. Our holding was based upon the duty imposed by § 323 of the Restatement (Second) of Torts on those who undertake to render services.[5] The assertion of negligence in *McClellan* was the HMO's failure to exercise reasonable care in selecting, retaining, and/or evaluating the plaintiff's primary care physician. We noted, that in order for a plaintiff to state a cause of action under § 323, the complaint must:

> contain factual allegations sufficient to establish the legal requirements that the HMO has undertaken (1) To render services to the plaintiff subscriber, (2) which the HMO should recognize as necessary

for the protection of its subscribers, (3) that the HMO failed to exercise reasonable care in selecting, retaining, and/or evaluating the plaintiff's primary care physician, and (4) that as a result of the HMO's failure to use such reasonable care, the risk of harm to the subscriber was increased.

*McClellan,* at 1059.

The only difference between *McClellan* and this case is the asserted failure to exercise reasonable care expressed in element number three. Here, the Shannons assert that HealthAmerica failed to exercise reasonable care in the rendition of "triage" nursing services to its subscribers who call their medical advice phone service. Thus under the facts of this case, in order for the Shannons to state a cause of action under § 323 the complaint must contain factual allegations sufficient to establish the legal requirements that HealthAmerica has undertaken (1) to render services to the plaintiff subscriber, (2) which HealthAmerica should recognize as necessary for the protection of its subscribers, (3) that HealthAmerica failed to exercise reasonable care in rendering telephonic "triage" services, and (4) that as a result of HealthAmerica's failure to use such reasonable care, the risk of harm to the subscriber was increased or the harm was suffered because of the subscriber's reliance upon the undertaking.

With these elements in mind, our review of the evidence finds that the Shannons presented sufficient evidence to establish a *prima facie* case under § 323 of the Restatement (Second) of Torts, requiring the question to be submitted to the jury. HealthAmerica and the trial court mischaracterize the duty involved as being the duty owed by Dr. McNulty to provide OB/GYN care. Such a characterization overlooks the fact that HealthAmerica provided a medical service in the form of telephonic advice. The adequacy of that service and the reasonableness of Mrs. Shannon's use thereof under the circumstances are questions for the jury. Since

---

5. Section 323 of the Restatement (Second) of Torts provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is sub-

ject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increased the risk of harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

the evidence was sufficient to establish a *prima facie* claim under either of the above theories, it was error for the trial court to have entered a compulsory nonsuit. Accordingly, we reverse the order refusing to remove the nonsuit and remand for a new trial.

Order reversed. Case remanded for a new trial. Jurisdiction relinquished.