**Dowhouer v. Judson**

C.P. of Dauphin County, no. 2548 S 1997.

*Charles W. Wasilefski,* for plaintiff.
*Joseph P. Hafer,* for defendants Polyclinic and Pinnacle Health.
*Katherine B. Kravitz,* for defendants Judson, Wisman, Travisano and Cardiovascular Surgical Institute.
*Sharon M. O'Donnell,* for defendant Rubbo.

BEFORE: LEWIS, EVANS AND HOOVER, *JJ.*

LEWIS, *J.,* March 10, 2000—Presently before this court is a medical negligence action that arises as a re-

sult of treatment given to plaintiff Alice M. Dowhouer by defendants from June 1995 through August 1995. Plaintiff became a patient of defendant Cardiovascular Surgical Institute on October 22, 1993 on a referral from her family physician for diagnosis and treatment of peripheral vascular disease in her legs.

In April 1995, plaintiff claims that she began to experience worsening symptoms related to the disease in her legs, causing increased limping. She also contends that she began having sternal discomfort (chest pains) at times radiating into her jaw with a sense of heavy salivation and associated shortness of breath. Due to the indigestion-like symptoms and the increasing pain in her right leg, plaintiff was admitted to defendant Polyclinic Hospital for outpatient testing on April 11, 1995. Defendant Dr. Judson was asked to consult and provide recommendations for her treatment. Plaintiff asserts that Dr. Judson examined her and suggested that surgery could aid the circulation in plaintiff's legs. He indicated that he would discuss with her his recommendation for surgical treatment of her legs at a later date in his office. Dr. Judson next saw plaintiff on May 5, 1995 as a follow-up to her April 11, 1995 consultation. He noted that her angina had become worse at this point. Plaintiff alleges that defendant Judson did not discuss leg surgery as he had suggested to her during the prior consultation. Instead, he scheduled her for coronary artery bypass surgery on a non-emergent basis. On June 20, 1995, plaintiff was admitted under the care of Dr. Judson to Polyclinic Hospital for open-heart surgery. In plaintiff's admission history, it was noted that she had increased problems in her right leg. Further, medical records indicated that pulses were not palpable below plaintiff's groin.

Plaintiff further alleges in her complaint that no special precautions were followed to protect the right leg during or after surgery from further circulatory insult to the already compromised circulatory system. The morning after surgery, plaintiff complained of pain in her right leg to Dr. Travisano, who plaintiff alleges visited her while making his routine rounds at Polyclinic for CSI, his medical group. He diagnosed a compartment syndrome and recommended a consult with an orthopedic surgeon. Dr. Rubbo, also a physician employed at CSI, examined plaintiff later that day. Plaintiff contends that Dr. Rubbo did not order anything additional to be done to her with regard to the circulatory problems in her right leg, although he noted her symptoms. Surgery was again performed on plaintiff that evening and, in fact, between June 21, 1995 and July 6, 1995, plaintiff contends that she underwent six surgeries on her right leg that eventually resulted in an above-the-knee amputation.

Plaintiff contends that as a result of the careless and negligent manner in which defendants provided medical care and treatment, she has suffered permanent and irreparable injury, increased risk of harm, substantial medical expense, extensive physical therapy, loss of income and earning capacity, embarrassment, humiliation and loss of life's pleasures and enjoyment.

Plaintiffs filed a complaint on December 18, 1998, and on September 8, 1999, defendants Judson, Travisano and CSI filed preliminary objections to plaintiffs' complaint and a brief in support of their preliminary objections. Plaintiffs filed their brief in opposition to the preliminary objections on October 5, 1999.

Defendants argue three points in their preliminary objections. First, defendants allege that the facts set forth in plaintiffs' complaint fail to set forth a cause of action

for which punitive damages may be recovered. Second, defendants allege that plaintiffs have failed to state a claim based on corporate negligence against CSI. Third, defendants allege that a negligence claim which contains only allegations of a lack of informed consent does not set forth a viable cause of action, failing to state a claim upon which relief may be granted.

## PUNITIVE DAMAGES

Initially, defendants contend that in paragraphs 39 and 56 of their complaint, plaintiffs allege the "gross negligence and willful and wanton careless conduct" of Drs. Judson and Travisano. Defendants claim that this language appears to be setting forth a claim for punitive damages; however, they maintain that plaintiffs' complaint fails to set forth a cause of action for which punitive damages may be recovered.

The law in Pennsylvania regarding punitive damages is that they are only available in extremely limited circumstances. The Pennsylvania Supreme Court has held that punitive damages may not be awarded for misconduct which constitutes ordinary negligence, such as inadvertence, mistakes or errors in judgment. *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 170, 494 A.2d 1088, 1097 (1985); *McDaniel v. Merck, Sharp and Dohme,* 367 Pa. Super. 600, 622, 533 A.2d 436, 447 (1987), *appeal denied,* 520 Pa. 589, 551 A.2d 215 (1988). Since punitive damages are meant as a deterrent, they are only proper for outrageous conduct, done with bad motive or reckless indifference to the interest of others. *Martin, supra* at 170-71, 494 A.2d at 1097. In determining whether punitive damages are appropriate, the defendant's state of mind is vital, and there must be an ap-

preciation of the risk, and the failure to act must be intentional, reckless or malicious. *Feld v. Merriam,* 506 Pa. 383, 396, 485 A.2d 742, 748 (1984).

The Pennsylvania Supreme Court has adopted section 908(2) of the Restatement (Second) of Torts. *Martin,* in discussing that section, states that "[p]unitive damages may be awarded for conduct that is outrageous, because of defendant's evil motive or reckless indifference to the rights of others." *Martin, supra* at 169, 494 A.2d at 1096. Therefore, in order to establish a claim for punitive damages, a plaintiff must show that the conduct of the defendant was outrageous because of the defendant's evil motive or his reckless indifference to the rights of others. The act, or failure to act, must be "malicious, willful, reckless or oppressive." *Id.* Relying on this standard and reasoning, Pennsylvania courts have limited the availability of punitive damages only to "punish the 'rare instances' of 'extreme behavior,' " not where facts demonstrate only "errors of judgment." *Chambers v. Domino's Pizza,* 110 Dauphin 1 (1989). (citations omitted)

This court finds that the facts of this case do not support a claim for punitive damages. Plaintiffs present no evidence of malicious, wanton, willful, reckless or oppressive conduct on the part of Drs. Judson and Travisano. Plaintiffs' complaint is that Drs. Judson and Travisano negligently failed to treat plaintiff Alice Dowhouer's circulatory problems properly. These allegations do not support a finding that the doctors' state of mind was intentional, reckless or malicious. Rather, this type of activity is expressly excluded from the circumstances that would support punitive damages in Pennsylvania. Therefore, plaintiffs' claim for punitive damages is dismissed.

## CORPORATE NEGLIGENCE

Next, this court grants defendants' second preliminary objection regarding plaintiffs' corporate negligence claim. This court finds that corporate negligence does not apply to the circumstance presented in this case. In *Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991), the Pennsylvania Supreme Court, in establishing the doctrine of corporate negligence as it relates to hospital liability, identified four factors that a plaintiff must establish to show that a hospital breached its duty. The factors are: (1) the hospital's duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) the hospital's duty to select and retain only competent physicians; (3) the hospital's duty to oversee all persons who practice medicine within its walls as to patient care; and (4) the hospital's duty to formally adopt and enforce adequate rules and policies to ensure quality care for its patients. *Id.* at 339-40, 591 A.2d at 707. The *Thompson* court held that "the corporate hospital's role in the total health care of its patients" required that hospitals be held to a standard of care separate and apart from the standard of care imposed upon physicians. *Id.* at 341, 591 A.2d at 708. The *Thompson* court also noted that for a hospital to be directly liable to a patient, the hospital must have actual or constructive knowledge of the defect or procedure that caused the harm. *Id.*

However, this court finds that corporate negligence does not apply to the corporate entity in this case. The case of *Remshifski v. Kraus,* 1845 Civil 1992, Monroe County, September 8, 1995, is the only published Pennsylvania court opinion to address the issue. The *Remshifski* court, in interpreting *Thompson* on a summary

judgment motion, found that the corporate negligence doctrine has not been extended to entities other than hospitals. *Remshifski* at 145. This court agrees with the Monroe County court and holds that this doctrine applies only to hospitals and not to physician practices like CSI.

Federal courts have addressed an issue similar to the one discussed in *Remshifski* and the one presently before this court. The United States District Court for the Eastern District of Pennsylvania in *Milan v. American Vision Center,* 34 F. Supp.2d 279 (E.D. Pa. 1998), was asked to decide whether the doctrine of corporate liability applied to optometrists' offices. In its analysis, the court reviewed *Thompson* and *Shannon v. McNulty,* 718 A.2d 828 (Pa. Super. 1998). The court in *Shannon* was faced with applying the corporate negligence doctrine to health maintenance organizations and held that because HMOs "involve themselves daily in decisions affecting their subscriber's medical care," *Thompson's* corporate liability duties should "be equally applied to an HMO when that HMO is performing the same or similar functions as a hospital." *Shannon,* 718 A.2d at 835, 836.

In *Milan,* the court examined both cases in its determination that the doctrine of corporate negligence should not be extended to optometrists' offices. The court stated:

"*Thompson* sets a standard of care for hospitals, not necessarily for all health care organizations. . . . The use of language throughout *Thompson* similarly suggests that the Supreme Court believed itself to be crafting a rule of hospital liability, not health care organization liability generally. . . .

"That *Thompson* concerned hospitals does not necessarily mean that the Pennsylvania Supreme Court will not in the future extend the doctrine of corporate liabil-

ity to other health care organizations[.] . . . The Pennsylvania Supreme Court has not yet spoken to that question, however. In the absence of such an authoritative determination, this federal trial court must undertake to predict what rule Pennsylvania's appellate courts will ultimately fashion. . . .

"No published case in the Commonwealth has considered the corporate negligence of an optometrist's office, or more generally of any sort of medical practice. However, the Superior Court has recently considered whether corporate negligence extends to [HMOs]." *Milan,* 34 F. Supp.2d at 280-81.

The court in *Milan* went on to discuss the effect of *Shannon:*

"The relevant question is, then, whether the Pennsylvania Supreme Court is likely to extend *Thompson* beyond *Shannon; i.e.,* whether the court will hold that corporate liability extends to doctors' practices in general or to optometrists' offices in particular.

"An HMO may legally constrain a subscriber's choice of medical care (or, more properly, her choice of covered medical care), and a hospital practically constrains a patient's choice by inducing her to rely on its comprehensive services in times when her ability to make choices will be compromised. An optometrist's office has no such effect." *Milan* at 281-82.

This court agrees with *Milan's* analysis. The court found that optometrists' offices, like doctors' offices in general, are distinguishable from hospitals and HMOs in a corporate negligence claim because they do not play a gate-keeping role in the total health care of their patients. The court concluded that, unlike the emergent medical situations in *Thompson,* "a visit to an optometrist's office generally does not require a patient to com-

mit to a single corporate health care provider as a matter of medical necessity." *Milan* at 282.

Similarly, the facts in the instant case do not indicate that plaintiff was required to commit to a single health care provider for treatment of her heart or the circulation in her legs. Plaintiff was free at any time to choose another vascular surgeon, either for a second opinion or to perform her surgery. Additionally, CSI did not play the central role in the total health care of plaintiff. CSI dealt strictly with plaintiff's cardiovascular health. Therefore, defendants' preliminary objection regarding corporate negligence is granted. CSI is a physician practice group devoted exclusively to the practice of cardiovascular surgery. Each of plaintiffs' claims, alleging corporate negligence, attempts to impose a corporate negligence-type duty upon CSI. In doing so, plaintiffs are attempting to extend the doctrine of corporate negligence to include specialty physician practices. As stated above, the basis for the creation of such a doctrine was due to the corporate entity's role in the delivery of total health care to the patient. A physician's group which is exclusively devoted to the practice of cardiovascular surgery does not deliver total health care to its patients. Therefore, this court finds that a specialty physicians' practice like CSI is not the type of corporate entity for which the Pennsylvania Supreme Court intended to be created in *Thompson.*

## INFORMED CONSENT

Finally, defendants' third preliminary objection regarding the negligent failure to obtain informed consent is granted. The requisite elements of a negligence cause of action are: duty, a breach of that duty, a causal relationship between the breach of the duty and the resulting

injury, and an actual loss or damages caused by the breach. *Casey v. Geiger,* 346 Pa. Super. 279, 289-90, 499 A.2d 606, 612 (1985). Paragraph 39(c) of plaintiffs' complaint is devoid of any allegations which would prove each of these requirements in order to state a negligence cause of action. Plaintiffs have alleged that defendant Judson was negligent for not obtaining informed consent prior to the bypass surgery. However, it is undisputed in Pennsylvania law that the doctrine of informed consent is based on a battery theory, not on negligence. *Kelly v. Methodist Hospital,* 444 Pa. Super. 427, 431, 664 A.2d 148, 150 (1995). In this case, this court finds that the plain reading of plaintiffs' complaint indicates that plaintiffs are attempting to assert an informed consent cause of action based on negligence. This theory does not constitute a viable cause of action in Pennsylvania. However, this court will grant plaintiffs leave to amend their complaint regarding this issue.

Accordingly, the following is entered:

## ORDER

And now, March 10, 2000, it is hereby ordered that defendants' preliminary objections are granted. Plaintiffs are granted 20 days leave to amend their complaint consistent with this opinion.