Delores BORDLEMAY, Executrix of
the Estate of Wanda Bordlemay,
Deceased, Appellant

v.

KEYSTONE HEALTH PLANS,
INC., Appellee.

Appeal of:  Delores Bordlemay.

Superior Court of Pennsylvania.

Submitted Sept. 24, 2001.

Filed Dec. 31, 2001.

Richard C. Angina, Harrisburg, for appellant.

Steven D. Snyder, John F. Yaninek, Kathleen Doyle Yaninek, Mette, Evans & Woodside, Harrisburg, for appellee.

Before DEL SOLE, President Judge, JOHNSON, and CERCONE, JJ.

JOHNSON, J.

¶ 1 Delores Bordlemay (Executrix), executrix of the Estate of Wanda Bordlemay (Decedent), appeals from the order granting summary judgment to Keystone Health Plans (Keystone). Executrix claims that the trial court erred in holding that she was collaterally estopped from proceeding against Keystone as a result of a prior medical malpractice action and jury verdict in favor of her treating physicians. Executrix also claims that the trial court erred in granting Keystone's motion for summary judgment on her claims of negligence and misrepresentation against Keystone. We conclude that the trial court did not err or abuse its discretion in granting the summary judgment motions. For the following reasons, we affirm the trial court's order granting summary judgment in favor of Keystone.

¶ 2 In November 1985, Decedent enrolled in Keystone's HMO plan through her employer. From February 1986 through January 1987, Decedent saw her primary care physicians for increasing pain and swelling in her right lower leg and ankle. Her physicians misdiagnosed her with a variety of ailments and finally referred her to an orthopedic specialist in January 1987. The specialist ordered a diagnostic imaging test that revealed a soft tissue mass that was later found to be cancerous. Unfortunately, amputation of the leg and chemotherapy proved to be unsuccessful, and Decedent died in May 1989 at the age of twenty-eight.

¶ 3 In August 1988, Decedent filed a complaint against her treating physicians. In January 1989, Decedent commenced an action against a number of HMO reimbursement systems who later agreed that Keystone would be the appropriate defendant. In May 1989, after Decedent's death, the named plaintiff in both cases

was changed to Executrix. In October 1990, Executrix filed a complaint against Keystone that contained the following five counts: (I) vicarious liability; (II) direct negligence; (III) corporate liability; (IV) fraud/misrepresentation; and (V) breach of contract. In September 1992, Executrix filed a motion to consolidate the two cases to which Keystone objected. The trial court denied consolidation. A jury returned a verdict in favor of the treating physicians, which was affirmed by this Court. The Pennsylvania Supreme Court denied the petition for allowance of appeal.

¶ 4 In 1995, while the case against the treating physicians was on appeal, Keystone filed a motion for summary judgment. The trial court deferred judgment pending the appeal of the medical malpractice claim against the treating physicians. In September 1996, Keystone filed a motion for summary judgment. The trial court granted summary judgment as to the vicarious liability, corporate liability, and breach of contract counts based on collateral estoppel arising from the medical malpractice case. In November 2000, Keystone filed a motion for summary judgment regarding the remaining counts of direct negligence and fraud/misrepresentation. The trial court granted the motion based on the lack of a causal connection between the policies and actions of Keystone and the harm suffered by Decedent. Executrix now appeals.

¶ 5 Executrix presents the following issues for our review:

1. DID THE TRIAL COURT ERR IN GRANTING SUMMARY JUDGMENT ON THE BASIS OF COLLATERAL ESTOPPEL, WHERE THE DEFENDANT IN THE INSTANT ACTION VIGOROUSLY OPPOSED CONSOLIDATION WITH THE CASE AGAINST THE TREATING PHYSICIANS AND THE ISSUES IN EACH CASE WERE MARKEDLY DIFFERENT?

2. DID THE TRIAL COURT ERR IN GRANTING SUMMARY JUDGMENT TO PLAINTIFF'S CLAIMS OF NEGLIGENCE AND MISRPRESENTATION, WHERE THE DEFENDANT HEALTH PLAN WAS NEGLIGENT INDEPENDENT OF THE CONDUCT OF THE PHYSICIANS AND WHERE THERE WAS A DUTY ON THE PART OF THE HMO TO DISCLOSE FINANCIAL INCENTIVES?

Brief for Appellant at 4.

■ ¶ 6 When reviewing questions of summary judgment, our standard of review is well settled:

We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Pappas v. Asbel* 564 Pa. 407, 768 A.2d 1089, 1095 (2001) (citations omitted).

■ ¶ 7 In her first issue, Executrix claims that the trial court erred in applying collateral estoppel in favor of Keystone based on the verdict in favor of the treating physicians in the prior medical malpractice case. Brief for Appellant at 13.

Executrix claims specifically that issue preclusion may not apply to her claims against Keystone because the issues in the two cases differ and because Keystone contested the consolidation with the medical malpractice case. Brief for Appellant at 16.

¶ 8 Executrix relies on Section 29 of the Restatement (Second) of Judgments in claiming that because Keystone fought her attempt to consolidate the actions, Keystone should not be able to benefit from collateral estoppel. Brief for Appellant at 15. As Keystone aptly notes, Executrix does not cite any Pennsylvania cases applying Section 29. Brief for Appellee at 12. Section 29 regulates the use of collateral estoppel in subsequent litigation that does not involve all the parties to the original litigation:

### § 29 Issue Preclusion in Subsequent Litigation with Others

A party precluded from relitigating an issue with an opposing party, in accordance with § 27 and § 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue. The circumstances to which considerations should be given include those enumerated in § 28 and also whether:

\* \* \* \* \*

(3) The person seeking to invoke favorable preclusion, or to avoid unfavorable preclusion, could have effected joinder in the first action between himself and his present adversary.

Restatement (Second) of Judgments § 29. Executrix relies on the following language of the Reporter's Note to Section 29, comment e: "On a similar analysis, a co-defendant in the first action who has succeeded in obtaining severance of the trial of the claim against him may be refused the benefits of preclusion arising from a determination adverse to the plaintiff in the trial involving the other defendant." Brief for Appellant at 15, (quoting Reporter's Note to Restatement (Second) of Judgments § 29, comment e). Executrix ignores the language of comment e and the rest of the Reporter's Note which focus on restricting a plaintiff rather than a defendant from asserting collateral estoppel. We conclude that, even under Section 29, Keystone may still benefit from estoppel, if applicable, because Keystone was never a co-defendant in the medical malpractice action, as required under the Reporter's Note to comment e, but instead merely objected to consolidation of the cases.

¶ 9 Collateral estoppel applies only if the following five conditions are met:

(1) the issue decided in the prior case was identical to one presented in the later case;

(2) there was a final judgment on the merits;

(3) the party against whom the plea is asserted was a party or in privity with a party to the prior case;

(4) the party ... against whom the doctrine is asserted has had a full and fair opportunity to litigate the issue in the prior proceedings and

(5) the determination in the prior proceeding was essential to the judgment.

*Pittsburgh v. Zoning Bd. of Adjustment,* 522 Pa. 44, 559 A.2d 896, 901 (1989).

¶ 10 Executrix does not contest elements 2, 3 and 5 necessary for collateral estoppel to apply. Instead, Executrix claims that many issues would be raised in the present case that were not litigated in the medical malpractice case. Brief for Appellant at 16. She claims that she was not provided an opportunity to litigate the overall quali-

ty of her medical care or argue that Keystone's structure and incentives caused Decedent's harm. Brief for Appellant at 17–18.

¶ 11 However, we are unable to discern from Executrix's brief any reasonable argument relating to the negligence of the HMO that would not necessarily depend on finding the physicians' care to be substandard. We conclude that the issue of the treating physicians' negligence was raised and fully litigated by Executrix in the prior medical malpractice action and that the physicians' negligence is a prerequisite to consideration of Keystone's negligence and breach of contract. Additionally, Keystone appropriately avoided consolidation with the medical malpractice case to which it had not been named as a defendant. Therefore, we conclude that the trial court did not err or abuse its discretion when it found Executrix estopped and granted summary judgment on counts I (vicarious liability), III (corporate liability) and V (breach of contract).

■ ¶ 12 In her second issue, Executrix claims that the trial court erred in granting summary judgment to counts II (direct negligence) and IV (fraud/misconception) of her complaint. In count II, Executrix alleges that Keystone is liable because Decedent was enrolled in its health plan that placed the health of its patients in opposition to the financial benefit of its physicians. Brief for Appellant at 20 (referencing Paragraphs 93–110 of the Complaint).

¶ 13 We note that recently the United States Supreme Court and our Pennsylvania Supreme Court have spoken on the issue of HMO liability. *See Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (holding that treatment decisions of HMOs are not preempted by ERISA); *see also Pappas v. Asbel,* 564 Pa. 407, 768 A.2d 1089 (2001) (reversing grant of summary judgment and remanding to

trial court on the issue of HMO's liability based on its treatment decisions). Executrix relies on *McClellan v. Health Maintenance Organization of Pennsylvania,* 413 Pa.Super. 128, 604 A.2d 1053 (1992) and *Shannon v. McNulty,* 718 A.2d 828 (Pa.Super.1998) to assert the applicability of Section 323 of the Restatement (Second) of Torts to HMOs. However, *McClellan* and *Shannon* are both easily distinguished from the case at hand. In *McClellan,* this Court reversed the grant of a demurrer where the plaintiff alleged that the HMO breached its "duty to use reasonable care in selecting and retaining primary care physicians" and as a result plaintiff "was not timely diagnosed or treated, resulting in her death." 604 A.2d at 1059. However, unlike the present case, the negligence of the doctors was still at issue in *McClellan* and thus whether the HMO used reasonable care in selecting its physicians was also at issue. In *Shannon,* this Court remanded for a new trial after reversing a grant of non-suit to the HMO based on the allegation that the HMO, through its triage nurse line, had failed to exercise reasonable care to the plaintiff. Executrix does not assert any comparable action by Keystone.

■ ¶ 14 In the present case, Executrix fails to allege any treatment decision by Keystone that resulted in her harm. Instead, Executrix claims that Keystone failed to exercise reasonable care in the formulation of its rules and policies in regard to its physician reimbursement system, and that as a result, Decedent's risk of harm increased. Brief for Appellant at 20. Executrix is, in essence, attacking the HMO system, which attempts to provide financial incentives to physicians to reduce the costs of health care by decreasing the utilization of health care services. *See Pegram,* 530 U.S. at 219, 120 S.Ct. 2143. The legislature, rather than this Court, is

the appropriate venue to debate the social, ethical and moral considerations raised by the HMO incentive system. *See id.* at 221, 120 S.Ct. 2143; *see also McClellan,* 604 A.2d at 1056, n. 6. We conclude that Executrix has not claimed any negligent act by Keystone beyond the fact that it provides incentives for physicians to ration the provision of health care. Because such incentive structures have not been recognized as a basis for HMO liability under Pennsylvania law, we conclude that the trial court did not err in granting summary judgment on Executrix's direct negligence count.

■ ¶ 15 In Count IV, Executrix asserts that Keystone committed fraud as a result of its failure to disclose information concerning its contracts with Decedent's physicians. Brief for Appellant at 21–22. Executrix asserts that the following language in Keystone's promotional material was a misrepresentation in light of the incentives to ration care under the physician contracts with Keystone: "with your doctor receiving prepayment from Keystone Health Plan to manage your health care services, there is no need to delay a service because you can not afford it. It frees you and your doctor of all these financial concerns." R. 28a. Executrix claims that Keystone had a duty to disclose all material facts important to a person making an informed decision regarding HMO enrollment. Brief for Appellant at 22. She asserts that such information includes details of the doctors' financial incentives. Brief for Appellant at 21–22.

¶ 16 Executrix correctly notes that the HMO Act does not specifically enumerate all possible required disclosures. Brief for Appellant at 22, quoting 40 Pa.S. § 991.2136(a). However, Executrix apparently failed to note that clause (b)(8) of the same section specifically addresses the issue of the disclosure of reimbursement methodologies and merely requires that such information be provided upon written request. *See* 40 Pa.S. § 991.2136(b)(8). Executrix does not allege that Decedent ever made such a request. Additionally, the section specifically does not require disclosure of "individual contracts or the specific details of any financial arrangement between a managed care plan and a health care provider." *Id.* We conclude that the legislature has spoken as to an HMO's duty to disclose details of their contracts with physicians. In view of the Decedent's failure to request disclosure pursuant to clause (b)(8), we conclude that Keystone did not have a duty to disclose the information on which Executrix bases her fraud claim. Therefore, we conclude that the trial court did not err in granting summary judgment to Keystone on Executrix's fraud/misrepresentation count.

¶ 17 For the foregoing reasons, we affirm the order of the trial court granting summary judgment on all counts.

¶ 18 Order **AFFIRMED.**

¶ 19 CERCONE, J. files a Concurring Statement.

CERCONE, President Judge Emeritus, Concurring.

¶ 1 I join in the erudite reasoning of my learned and distinguished colleagues with respect to their analysis of the issues raised by Appellant/Executrix in all respects but one. I agree with my colleagues that the claims of Appellant against Keystone for vicarious liability are collaterally estopped by virtue of the jury's verdict in Appellant's prior action against her treating physicians for negligence. It is, of course, axiomatic that a party cannot be held vicariously liable for the acts of its agents or employees when its agents or employees were found not to have been negligent. I also agree that Appellant's

claim for breach of contract was properly dismissed since it was expressly founded on an allegation that the decedent's treating physicians provided her with incompetent and substandard care in breach of the terms of the contract between decedent and Keystone. *See* Appellant's Complaint, filed 10/19/1990, at ¶ 163. The jury's prior finding that the decedent's treating physicians were not negligent is therefore binding on this issue as well.

¶ 2 I cannot agree, however, that Count III of Appellant's complaint against Keystone, which is based on a theory of corporate negligence, was barred in its entirety by the doctrine of collateral estoppel. This count of Appellant's complaint provided in relevant part:

136. [Appellee] Keystone Health Plans, Inc. is corporately liable to the plaintiff for the injuries alleged above for its negligence, gross negligence, wanton misconduct, outrageous conduct, and reckless and/or intentional disregard for the well being and safety of the [Appellant] in:

(a) enrolling, marketing and using [the treating physicians] as HMO physicians without having verified the competence of the physicians through an adequate investigation into their education, training, experience, and prior acts of professional malpractice;

(b) failing to have instituted effective procedures for the selection of competent and qualified doctors as HMO physicians, such procedures minimally requiring an investigation into the education, training, experience, and prior acts of professional malpractice of the physicians;

(c) failing to have instituted an effective quality control program designed to periodically review and assess the competence of HMO physicians, so as to

have removed [the treating physicians] as HMO physicians;

(d) failing to verify the truthfulness of information which [the treating physicians] provided to the HMO in their applications for enrollment as HMO physicians; and

(e) enrolling, hiring, marketing, and using [the treating physicians] as HMO physicians despite repeated prior incidents of professional malpractice on the part of the aforesaid physicians.

**(f) promulgating and implementing policies and procedures which discourage adequate medical testing, consultation, and evaluation to the detriment of its enrollees.**

Appellant's Complaint, filed 10/19/1990, at ¶ 136(a)-(f) (emphasis supplied).

¶ 3 Our Supreme Court has summarized the theory of corporate negligence as follows:

In *Thompson* [*v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991) ] this Court first adopted the theory that a corporation, specifically a hospital, can be held directly liable for negligence. We explained the concept of corporate negligence as follows:

Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient.

*Thompson,* 527 Pa. at 339, 591 A.2d at 707. Under *Thompson,* a hospital has the following duties:

(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent phy-

sicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

*Id.* at 339–40, 591 A.2d at 707 (citations omitted).

Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action in corporate negligence. *Moser v. Heistand,* 545 Pa. 554, 558, 681 A.2d 1322, 1325 (1996). Instead, corporate negligence is based on the negligent acts of the institution. *Moser.* A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees. *Id.* Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts.

*Welsh v. Bulger,* 548 Pa. 504, 513, 698 A.2d 581 (1997).

¶ 4 In *Shannon v. McNulty,* 718 A.2d 828 (Pa.Super.1998) our Court explicitly extended the theory of corporate negligence to Health Maintenance Organizations which undertake to provide medical treatment rather than simply providing money for payment or reimbursement for medical services. Our Court said:

In adopting the doctrine of corporate liability the *Thompson* court recognized 'the corporate hospital's role in the total health care of its patients.' *Thompson,* at 708. Likewise, we recognize the central role played by HMOs in the total health care of its subscribers. A great deal of today's healthcare is channeled through HMOs with the subscribers being given little or no say so in the stewardship of their care. Specifically, while these providers do not practice medicine, they do involve themselves daily in decisions affecting their subscriber's medical care. These decisions may, among others, limit the length of hospital stays, restrict the use of specialists, prohibit or limit post hospital care, restrict access to therapy, or prevent rendering of emergency room care. While all of these efforts are for the laudatory purpose of containing health care costs, when decisions are made to limit a subscriber's access to treatment, that decision must pass the test of medical reasonableness. To hold otherwise would be to deny the true effect of the provider's actions, namely, dictating and directing the subscriber's medical care.

Where the HMO is providing health care services rather than merely providing money to pay for services their conduct should be subject to scrutiny. We see no reason why the duties applicable to hospitals should not be equally applied to an HMO when that HMO is performing the same or similar functions as a hospital. When a benefits provider, be it an insurer or a managed care organization, interjects itself into the rendering of medical decisions affecting a subscriber's care it must do so in a medically reasonable manner.

Here, [the HMO] provided a phone service for emergency care staffed by triage nurses. Hence, it was under a duty to oversee that the dispensing of advice by those nurses would be performed in a medically reasonable manner. *Accordingly, we now make explicit that which was implicit in McClellan [v. Health Maintenance Organization of Pennsylvania, 413 Pa.Super. 128, 604 A.2d 1053 (1992)] and find that HMOs may, under the right circumstances, be held corpo-*

*rately liable for a breach of any of the Thompson duties which causes harm to its subscribers.*

*Id.* 718 A.2d at 835 (emphasis supplied).

¶ 5 Since subparagraphs (a)-(e) of Count III of Appellant's complaint allege that Keystone was liable under a theory of corporate negligence for failing to develop, implement, and enforce adequate policies for the hiring and supervision of the particular doctors who treated Appellant's decedent, I would agree that these portions of Count III are barred by the jury's finding in the prior proceeding that the decedent's treating physicians were not negligent. Such a finding by the jury in the prior proceeding in effect established that Keystone did not breach the second *"Thompson* duty," which is to select and retain competent physicians. However, our Court recognized in *Shannon, supra* that an HMO such as Keystone may, under certain circumstances, be held liable for breaching *any* of the *Thompson* duties and causing harm to its subscribers.

¶ 6 Subparagraph (f) of Count III of Appellant's complaint is an allegation that Keystone was corporately liable in its own right based on its formulation and promulgation of policies discouraging testing, consultation and evaluation of its enrollees. This is an allegation that Keystone breached the fourth *"Thompson* duty" which is "to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients." *Thompson, supra.* For Keystone to be found negligent under this theory of corporate negligence required Appellant to show that Keystone breached a duty of care owed directly to Appellant's decedent to formulate, adopt, and enforce adequate testing and diagnostic policies, and that it breached this duty thereby causing Appellant's decedent harm. This is, as Appellant suggests, an entirely separate issue not dependent on whether the treating physicians were negligent. *C.f. Welsh, supra* ("Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action in corporate negligence.") Consequently, I believe that the Appellant was not precluded from proceeding on this part of her complaint under the doctrine of collateral estoppel, solely because of the jury's verdict in favor of the treating physicians. Since her case against Keystone was not consolidated with her action against her decedent's treating physicians, at Keystone's request, Appellant did not have the opportunity in the prior proceeding to litigate this specific issue. *See Muhammad v. Strassburger,* 526 Pa. 541, 546, 587 A.2d 1346, 1348 (1991) (a "party against whom a plea of collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in question in a prior action.")

¶ 7 Nevertheless, I concur in the majority's affirmance of the Trial Court's grant of summary judgment because I feel that it was warranted under the particular evidentiary circumstances of this case. As the majority notes in its decision to uphold the Trial Court's dismissal of Count II of Appellant's complaint, which alleges the direct negligence of Keystone, Appellant has claimed no specific treatment decision of Keystone which caused the decedent harm. Moreover, in dismissing Count II of the Appellant's complaint, which was based entirely on a theory of Keystone's direct negligence in its own right, the Trial Court found as follows:

To find that the [Appellant's] claims should proceed to trial, the [Appellant] would have to offer some proof to establish [Appellee's] liability that is independent of the actions of the doctors who treated [Appellant.] An attempt to ar-

gue that her treating physicians were negligent and that their actions can be imputed to Keystone must necessarily fail because a jury has already determined the contrary to be true. *[Appellant] would instead have to prove some causal relationship between the policies of the HMO and the harm suffered by [the decedent]. There is no evidence in this case of such a causal connection.*

Trial Court Opinion, filed 4/30/2001, at 3 (emphasis supplied).

¶ 8 Thus, it is for these reasons that I would hold that summary judgment was proper with respect to subparagraph (f) of Count III of Appellant's complaint since Appellant has failed to produce evidence that Keystone had interjected itself into the specific treatment decisions made with respect to Appellant's decedent, or that its policies with respect to discouraging testing, consultation, or evaluation caused Appellant's decedent harm. Hence summary judgment was proper on this basis. *See Campanaro v. Pennsylvania Electric Company* 738 A.2d 472, 475–476 (Pa.Super.1999), *appeal denied,* 561 Pa. 684, 751 A.2d 183 (2000) (citing Pa.R.C.P. 1035.2) ("Summary judgment may be properly entered only where (1) there is no genuine issue of material fact as to a necessary element of the cause of action which could be established by additional discovery or an expert report, or (2) after completion of discovery and production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action.")

¶ 9 Consequently, I join the holding of the majority in all other respects but concur in the result with respect to the dismissal of the cause of action for corporate negligence against Keystone which was predicated on its alleged implementation of policies and procedures that discourage adequate testing, consultation and evaluation of its enrollees.