768 A.2d 1089

**Basil PAPPAS and Theodora Pappas, H/W, Plaintiffs,**

**v.**

**David S. ASBEL, D.O., Defendant.**

**Pennsylvania Hospital Insurance Co. (PHICO) and The Commonwealth of Pennsylvania Medical Professional Liability Catastrophe Loss Fund (Cat Fund), Defendants/Appellees.**

**United States Healthcare System of Pennsylvania, Inc., Additional Defendant/Appellant.**

Supreme Court of Pennsylvania.

Submitted Aug. 29, 2000.

Decided April 3, 2001.

408

Burt M. Rublin, Philadelphia, for U.S. Healthcare Systems of Pa.

Wayne Berry, Philadelphia, for Amicus–Secty. Dept. of Labor

Stephan A. Ryan, for PHICO and Commonwealth.

James E. Colleran, Philadelphia, for Basil and Theodora Pappas.

James I. Devine, Philadelphia, for David S. Asbel.

Leslie Anne Miller, Peter J. Hoffman, Veronica N. Olszewski, Philadelphia, for Amicus–American Med. Ass., et al.

Joseph M. Melillo, Harrisburg, for Amicus–Pa. Trial Lawyers Assoc.

Elizabeth Metz, Harrisburg, for Amicus–Pa. Medical Society.

Before: FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

CAPPY, Justice.

Based on the principles the United States Supreme Court articulated in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), we issued an opinion in the instant case on December 23, 1998, holding that the state law medical negligence claims asserted against third-party defendant United States Healthcare Systems of Pennsylvania, Inc. ("U.S. Healthcare") are not preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

1001 *et seq. Pappas v. Asbel,* 555 Pa. 342, 724 A.2d 889 (1998) (*"Pappas I "*). Accordingly, we affirmed the Superior Court's order, reversing the trial court's entry of summary judgment in U.S. Healthcare's favor. *Id.* at 894.[1] On June 19, 2000, the Supreme Court entered an order granting certiorari in *Pappas I,* vacating the judgment of this court, and remanding the case for our further consideration in light of *Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). For all the reasons that follow, we adhere to our original opinion and order.

The facts and procedural history, as set forth in *Pappas I,* bear repeating.

At 11:00 a.m. on May 21, 1991, Basile Pappas ("Pappas") was admitted to Haverford Community Hospital ("Haverford") through its emergency room complaining of paralysis and numbness in his extremities. At the time of his admission, Pappas was an insured of HMO–PA, a health maintenance organization operated by U.S. Healthcare.

Dr. Stephen Dickter, the emergency room physician, concluded that Pappas was suffering from an epidural abscess which was pressing on Pappas' spinal column. Dr. Dickter consulted with a neurologist and a neurosurgeon; the physicians concurred that Pappas' condition constituted a neurological emergency. Given the circumstances, Dr. Dickter felt that it was in Pappas' best interests to receive treatment at a university hospital.

Dr. Dickter made arrangements to transfer Pappas to Jefferson University Hospital ("Jefferson") for further treatment. At approximately 12:40 p.m. when the ambu-

---

1. Our reasons for finding against ERISA preemption differed from those relied upon by the Superior Court. The Superior Court was of the view that considerations of cost containment that drive HMO decisions did not exist when Congress enacted ERISA. *Pappas v. Asbel,* 450 Pa.Super. 162, 675 A.2d 711, 716 (1996). The Superior Court concluded, therefore, that Congress could not have intended to preempt that which it did not know would come into existence. *Id.* Inasmuch as one year preceding the enactment of the statute, Congress passed the Health Maintenance Organization Act of 1973, 42 U.S.C. § 300e *et seq.,* we could not agree that HMOs were unforeseen by Congress when it drafted ERISA. *Pappas I,* 724 A.2d at 893 n. 6.

lance arrived, Dr. Dickter was alerted to the fact that U.S. Healthcare was denying authorization for treatment at Jefferson. Ten minutes later, Dr. Dickter contacted U.S. Healthcare to obtain authorization for the transfer to Jefferson. At 1:[05]p.m., U.S. Healthcare responded to Dr. Dickter's inquiry and advised him that authorization for treatment at Jefferson was still being denied, but that Pappas could be transferred to either Hahnemann University ("Hahnemann"), Temple University or Medical College of Pennsylvania ("MCP").

Dr. Dickter immediately contacted Hahnemann. That facility advised Haverford at approximately 2:20 p.m. that it would not have information on its ability to receive Pappas for at least another half hour. MCP was then reached and within minutes it agreed to accept Pappas; Pappas was ultimately transported there at 3:30 p.m. Pappas now suffers from permanent quadriplegia resulting from compression of his spine by the abscess.

Pappas and his wife filed suit against Dr. David Asbel, his primary care physician, and Haverford. They claimed that Dr. Asbel had committed medical malpractice and that Haverford was negligent in causing an inordinate delay in transferring him to a facility equipped and immediately available to handle his neurological emergency.

Haverford then filed a third party complaint against U.S. Healthcare, joining it as a party defendant for its refusal to authorize the transfer of Pappas to a hospital selected by the Haverford physicians. Dr. Asbel also filed a cross-claim against U.S. Healthcare seeking contribution and indemnity.

U.S. Healthcare filed a motion for summary judgment on all of the third party claims, alleging that the third party claims are preempted by § 1144(a) of ERISA.[1] The trial court granted the motion.[2] The Superior Court on appeal, however, determined that ERISA did not preempt the state law claims. This court subsequently granted U.S. Healthcare's Petition for Allowance of Appeal in order to determine whether these third party claims fall within the scope of those state actions which are preempted by ERISA.

412

[1] It is uncontested that U.S. Healthcare is an "employee benefits plan" pursuant to ERISA, 29 U.S.C. § 1002(1), and that ERISA therefore applies to this matter.

[2] Approximately one year after the trial court granted summary judgment in U.S. Healthcare's favor, Dr. Asbel and Haverford settled the actions brought against them. They have been substituted in this appeal by their insurers, Pennsylvania Hospital Insurance Co. ("PHICO") and the Commonwealth of Pennsylvania Medical Professional Liability Catastrophic Loss Fund ("CAT Fund").

*Pappas I*, 724 A.2d at 889–91.

Our legal analysis in *Pappas I* began with a review of the basic principles of preemption law. We noted that the Supremacy Clause of the United States Constitution, U.S. Const., art. VI, cl. 2, gives the United States Congress the power to preempt state law, and observed that in determining whether state law is preempted by federal law, we were to assume that the historic powers of the states are not superceded unless preemption is the "clear and manifest purpose" of Congress. *Id.* at 891 (*quoting Cipollone v. Liggett Group*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)) (citations omitted).

Turning to the express preemption section of ERISA, which states that "the provisions of this subchapter ... shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....", 29 U.S.C. § 1144(a), we recognized that in the 1980's and early 1990's, the Supreme Court had given ERISA preemption a notably expansive scope based on the plain language of this section. *Pappas I*, 724 A.2d at 891–92. With its 1995 decision in *Travelers*, however, we determined that the Court had signaled a change in course, instructing the courts to look to the objectives of ERISA, and not solely to the bare, "unhelpful" text of the statute, for guidance in deciding questions of preemption. *Id.* at 892, (*quoting Travelers*, 514 U.S. at 656, 115 S.Ct. 1671). We deemed it significant that the Court determined that the "basic thrust of the preemption provision ... was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans"; that it recognized fairly significant bounds on preemption when it stated that "[p]re-emption does not occur ... if

the state law has only a tenuous, remote, or peripheral connection with covered plans, as in the cases with many laws of general applicability"; and that it cautioned that "nothing in the language of [ERISA] or in the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern." *Id.* at 892 (*quoting Travelers,* 514 U.S. at 661, 115 S.Ct. 1671).

Applying *Travelers* and its progeny, *California Division of Labor Standards Enforcement v. Dillingham Construction NA., Inc.,* 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) and *De Buono v. NYSA–ILA Medical and Clinical Services Fund,* 520 U.S. 806, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997), to the case *sub judice,* we determined that the negligence claims in plaintiffs' complaint, which Haverford incorporated by reference against U.S. Healthcare in its third party complaint, are not preempted. *Pappas I,* 724 A.2d at 894.[2] We found that they do not "relate to" an ERISA plan within the meaning of 29 U.S.C. § 1144(a), and that local negligence laws, like many laws of general applicability, are only remotely connected to ERISA plans. *Id.* at 893, 894. In view of the Supreme Court's determination that Congress did not intend to preempt state laws aimed at regulating health care, we held it would have been inappropriate to conclude that Haverford's claims, in which the issue of U.S. Healthcare's allegedly dilatory delivery of contractually-guaranteed medical benefits were intertwined with the question of safe medical care, are preempted by ERISA. *Id.* at 893.[3]

2. Haverford asserted the following allegations from plaintiffs' complaint against U.S. Healthcare:
 24. The negligence of [Haverford] . . . consisted of the following:
 a. Failing to transfer the patient to a hospital capable and competent of administering to his acute medical condition in a prompt and timely fashion;
 b. Delaying inordinately in transferring the patient, keeping him at [Haverford] during which time his spinal cord compression continued, with resulting permanent damage to the patient's spinal cord.
 Complaint, para. 24.

3. Justice Nigro filed a concurring opinion. In Justice Nigro's view, the facts demonstrated that "U.S. Healthcare's actions constituted, in ef-

We now turn, as instructed by the Supreme Court, to a reconsideration of our decision in *Pappas I* in light of *Pegram*. We start with a somewhat detailed rendition of *Pegram's* facts, as they are critical to our present task. The case arose out of a lawsuit brought by Cynthia Herdrich against her treating physician, Dr. Lori Pegram, and the health maintenance organization ("HMO") that Dr. Pegram and her partners owned and operated. The HMO had contracted with the company that employed Herdrich's husband to provide prepaid medical services to its employees and their respective families. Dr. Pegram examined Herdrich for pain in the midline area of her groin, and discovered an inflamed mass in her abdomen. Dr. Pegram did not order an immediate ultrasound at the local hospital, but decided to wait some eight days for an ultrasound at a facility staffed by HMO physicians. Before the ultrasound could be performed, Herdrich's appendix ruptured, causing peritonitis.

Herdrich sued Dr. Pegram and the HMO in state court for medical malpractice, and later added two counts of state law fraud. Asserting that the fraud counts were preempted by ERISA, Pegram and the HMO removed the case to federal district court, and moved for summary judgment. The district court granted the defendants summary judgment on the first count, but granted Herdrich leave to amend the second. She did, alleging that the provision of medical services under the terms of the HMO, which rewarded its physician owners for limiting medical care, amounted to an inherent or anticipatory breach of ERISA's fiduciary duties as set forth in 29 U.S.C. § 1109(a), to make decisions with the exclusive interest of plan participants in mind. The HMO moved to dismiss the ERISA count for failure to state a claim upon which relief could be granted. Finding that the HMO was not involved in the events at hand as an ERISA fiduciary, the district court

fect, an individual medical decision or judgment as opposed to a decision affecting the administration of an employee benefit plan." *Pappas I*, 724 A.2d at 889. It can fairly be said that Justice Nigro's approach to the question of ERISA preemption in this case anticipated the Supreme Court's reasoning in *Pegram*.

sustained the motion. The Court of Appeals for the Seventh Circuit reversed.

The Supreme Court granted certiorari to determine whether treatment decisions made by an HMO, acting through its physicians, are fiduciary acts within the meaning of ERISA. The Court held that they are not. *Pegram*, 530 U.S. 211, 120 S.Ct. at 2146.

In the course of doing so, the Court set forth two guiding principles. First, HMO physicians occupy dual roles. They act like plan administrators when they determine, for example, whether a participant's condition is covered, and as health care providers, when they decide upon the medical treatment a participant will receive. *Id.* at 2153–54.

Second, HMO physicians make three types of decisions. "[P]ure 'eligibility decisions' turn on the plan's coverage of a particular condition or medical procedure for its treatment," *id.* at 2154, such as "whether a plan covers an undisputed case of appendicitis." *Id.* at 2155. " 'Treatment decisions,' by contrast, are choices about how to go about diagnosing and treating a patient's condition: given a patient's constellation of symptoms, what is the appropriate medical response?" *Id.* at 2154. "Mixed eligibility and treatment decisions" are just what their name implies-decisions in which coverage and medical judgment are intertwined. *Id.* at 2154–55. In this regard, the Court explained:

> [A] great many and possibly most coverage questions are not simple yes-or-no questions, like whether appendicitis is a covered condition (when there is no dispute that a patient has appendicitis), or whether acupuncture is a covered procedure for pain relief (when the claim of pain is unchallenged). The more common coverage question is a when-and-how question. Although coverage for many conditions will be clear and various treatment options will be indisputably compensable, physicians still must decide what to do in particular cases. . . . In practical terms, these eligibility

decisions cannot be untangled from physicians' judgments about reasonable medical treatment. . . .

*Id.* at 2154.

To illustrate the wide array of decisions that are of the mixed type, the Court noted the decisions mentioned in Herdrich's complaint: "physician's conclusions about when to use diagnostic tests; about seeking consultations and making referrals to physicians and facilities other than [the HMO's]; about proper standards of care, the experimental nature of a proposed course of treatment, the reasonableness of a certain treatment and the emergency character of a medical condition." *Id.* at 2155.

Turning to the case at hand, the Court found that the HMO, through Dr. Pegram, made a mixed decision, "decid[ing] (wrongly, as it turned out) that Herdrich's condition did not warrant immediate action; the consequence of that medical determination was that [the HMO] would not cover immediate care, whereas it would have done so if Dr. Pegram had made the proper diagnosis and judgment to treat." *Id.* at 2154.

The Court then held that Congress did not intend that any HMO be treated as an ERISA fiduciary to the extent that it makes mixed eligibility and treatment decisions acting through its physicians. *Id.* at 2155.[4] Observing that under the common law of trusts, which is the source of ERISA's fiduciary duties, fiduciary responsibility characteristically attaches to financial decisions about managing assets and property, the Court doubted that Congress would have ever thought of a mixed decision as fiduciary in nature. *Id.* at 2155–56. Because the defense of any HMO of a mixed decision would be that its physician acted for good medical reasons, the plausibility of which would require reference to traditional standards of reasonable medical practice in like

4. The HMO in *Pegram* was owned by its physicians. U.S. Healthcare contracts with independent physicians to provide services. *Pegram's* result was based on the nature of the HMO's decision, not on the structure of the HMO making it. *Pegram,* 530 U.S. at 230–31, 120 S.Ct. at 2155. Further, the Supreme Court's holding was all-inclusive as to HMOs. *Id.* Thus, the difference in organization between the HMO in *Pegram* and U.S. Healthcare is not relevant to this analysis.

circumstances, the Court was concerned that a decision to view a mixed decision as an act of ERISA fiduciary duty would "federalize malpractice litigation". *Id.* at 2157–58. Lastly, the Court touched upon (but declined to resolve) the "puzzling issue of preemption" that would be raised by the imposition of ERISA's fiduciary requirements upon an HMO physician making a pure treatment or mixed decision, in view of its holding in *Travelers:*

> On its face, federal fiduciary law applying a malpractice standard would seem to be a prescription for preemption of state malpractice law, since the new ERISA cause of action would cover the same subject of a state-law malpractice claim.... To be sure, [*Travelers*] throws some cold water in the preemption theory; there, we held that, in the field of health care, a subject of traditional state regulation, there is no ERISA preemption without clear manifestation of congressional purpose. But in that case the convergence of state and federal law was not so clear as in the situation we are positing; the state-law standard had not been subsumed by the standard to be applied under ERISA. We could struggle with this problem, but first it is well to ask, again, what would be gained by opening the federal courthouse doors to a fiduciary malpractice claim....

*Pegram,* at 2158 (citations omitted).

[1] While *Travelers* and *Pegram* deal with different aspects of ERISA, for our present purposes, they share common ground. *Travelers* instructs that ERISA does not preempt state law that regulates the provision of adequate medical treatment. *Pegram* instructs that an HMO's mixed eligibility and treatment decision implicates a state law claim for medical malpractice, not an ERISA cause of action for fiduciary breach. Thus, if Haverford's third party claim against U.S. Healthcare arose out of a mixed decision, it is, according to *Pegram,* subject to state medical malpractice law, which is what Haverford asserted. Moreover, under *Travelers,* it is not preempted by ERISA.

It follows that we must now determine what the record on summary judgment reveals with regard to the

nature of the U.S. Healthcare's decision. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State University v. County of Centre*, 532 Pa. 142, 615 A.2d 303, 304 (1992). Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. *Skipworth v. Lead Industries Ass'n, Inc.*, 547 Pa. 224, 690 A.2d 169, 171 (1997). Our scope of review of a trial court's order granting or denying summary judgment is plenary, *O'Donoghue v. Laurel Savings Ass'n*, 556 Pa. 349, 728 A.2d 914, 916 (1999), and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion. *Cochran v. GAF Corp.*, 542 Pa. 210, 666 A.2d 245, 248 (1995).

Having looked again at the record, there are facts that are not disputed, in addition to those set forth in *Pappas I*, that are important to our analysis. Dr. Dickter, the physician who first saw Pappas in the emergency room of Haverford on May 21, 1991, at about 11:00 a.m., received permission from Jefferson to admit Pappas to its spinal cord trauma center. Dr. Dickter chose Jefferson because it, unlike other hospitals, had designated space for spinal trauma cases and was able to determine immediately whether it was in a position to receive a new patient. When Dr. Dickter learned at 12:40 p.m. from ambulance personnel that Pappas' transfer to Jefferson was not HMO approved, he telephoned U.S. Healthcare at 12:50 p.m. and asked that it reconsider its decision. Dr. Dickter spoke to Elaine Norman, a U.S. Healthcare representative, and told her that Pappas' condition constituted a neurological emergency that needed immediate attention, and for which he had made arrangements with Jefferson. Ms. Norman advised Dr. Dickter that she was not authorized to take action one way or the other, but that she would consult with someone who was. At 1:05 p.m., Dr. Dickter spoke with Carol DeLark, another U.S. Healthcare representative. She told him that

Dr. Liebowitz, one of U.S. Healthcare's physicians who had the authority to decide such matters, reviewed Pappas' case; that the referral to Jefferson, a non-HMO hospital, continued to be denied; and that a referral to the facilities affiliated with Hahnemann, Temple University or MCP was approved. At about 3:30 p.m., through Dr. Dickter's efforts, Pappas was admitted to MCP.

Not surprisingly, U.S. Healthcare argues that its decision about Pappas' referral "constituted a quintessential 'coverage' determination".[5] We, however, disagree. In our view, the undisputed facts in this case, and the inferences drawn from them, establish the sort of mixed eligibility and treatment decision that *Pegram* discussed.[6] Dr. Leibowitz, U.S. Healthcare's physician, reviewed Pappas' case, and rejected another medical doctor's opinion based on his clinical judgment that Pappas needed to be referred to Jefferson for treatment of a medical emergency. Instead of referring Pappas to Jefferson, a non-HMO hospital, as Dr. Dickter recommended, Dr. Leibowitz referred Pappas to one of three other facilities for medical care. He did not, in the Supreme Court's words, only make a "simple yes or no" decision as to whether Pappas' condition was covered; it clearly was. Rather, Dr. Leibowitz also determined where and, under the circumstances, when

5. A number of the statements U.S. Healthcare made when this appeal was originally heard do not reflect its present position that its decision was entirely devoid of medical judgment as to treatment. In its Reply Brief, for example, U.S. Healthcare stated that its "sole involvement in this matter was to answer a physician's question concerning what nearby hospitals were capable of treating the patient's condition." (Reply Brief for Appellant at 2). Later, U.S. Healthcare recited that it "advised Dr. Dicker of three HMO PA participating hospitals in the area—Hahnemann, Temple and MCP—that could provide the same treatment available at Jefferson." (Reply Brief for Appellant at 4).

6. We need not remand this matter for further findings. The record is undisputed and clear on the basic facts. Moreover, an appellate court may draw its own inferences from basic facts and arrive at its own conclusions when a finding of fact is simply a deduction from other facts and the ultimate fact in question is purely a result of reasoning. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 391 n. 6 (1986). The question of a decision's type—eligibility, treatment or mixed—is this sort of "ultimate fact", deduced from the basic facts through reasoning.

420

Pappas' epidural abscess would be treated. His was a mixed eligibility and treatment decision, the adverse consequences of which, if any, are properly redressed, as *Pegram* teaches, through state medical malpractice law. This law as *Travelers* teaches, is not preempted by ERISA.

We conclude, therefore, that our reasoning and result in *Pappas I* are consistent with the Supreme Court's decision in *Pegram*. Accordingly, we confirm our original disposition; the order of the Superior Court, reversing the grant of summary judgment to U.S. Healthcare is affirmed.[7] This matter is remanded to the trial court for further proceedings consistent with this opinion.

7. With due respect to our learned colleague, we believe the dissent gives our analysis too broad a reading, and, it would seem, bases its disagreement with our holding on a question not raised in this appeal.

With regard to our analysis, there is no reason for concern that from this point forward, conflict preemption issues arising under ERISA will include no more than the "mere identification of whether a fiduciary act was involved". (Dissenting Opinion at 430). Our analysis of ERISA preemption in *Pappas I* was founded on the preemption provision of the statute, 29 U.S.C. 1144(a), and the Supreme Court's most recent teaching on the matter. This analysis, of course, continues to apply. It was the Supreme Court's request that we consider our decision in *Pappas I,* in light of its decision in *Pegram,* that necessitated our finding the conceptual relationship between a claim for breach of ERISA's fiduciary duties and the assertion that a state law claim for medical malpractice is preempted.

Turning to the main focus of the dissent, we read it as stating that this court should articulate a new and definitive duty or standard of care for HMO physicians making mixed eligibility and treatment decisions, and until that task is completed, issues of ERISA preemption cannot be resolved. Preliminarily, we note that the issue of duty or standard of care is not before us. We granted allocatur to consider U.S. Health-care's motion for summary judgment, in which it asserted that the third party state law medical malpractice claims brought against it are preempted by ERISA *per se.* Whether the element of duty or the standard of care to which U.S. Healthcare should be held when third party plaintiffs attempt to prove their case differs from the duty or standard of care that Pennsylvania law imposes on non-HMO physicians is an issue that may remain for another day.

Moreover, the question the dissent poses conceivably presents a "Catch–22" form of circular reasoning. That is to say, any answer leads to ERISA preemption. On the one hand, according to the dissent, the application of a standard of care to an HMO's mixed eligibility and treatment decision that does not take into account an HMO's way of doing business arguably has more than a "tenuous, remote, or peripheral connection" with a covered plan, *Travelers,* 514 U.S. at 661, 115

SAYLOR, Justice, dissenting.

In response to the United States Supreme Court's remand directive for this Court to reconsider its prior decision in *Pappas v. Asbel,* 555 Pa. 342, 724 A.2d 889 (Pa.1998)("*Pappas I* "),[1] in light of *Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)("*Pegram II* "), the majority concludes that *Pegram II* establishes that the third-party cause of action against Appellant United States Healthcare Systems of Pennsylvania, Inc. ("U.S. Healthcare") is not preempted by ERISA, and that such cause should therefore be resolved according to state medical malpractice law. In so holding, the majority finds that *Pegram II* 's conclusion that ERISA does not establish a cause of action for breach of fiduciary duty predicated upon a managed care organization's "mixed eligibility" decisions, *see Pegram II,* 530 U.S. at 228–29, 120 S.Ct. at 2154–55, equally establishes that such decisions are fully exposed to state tort law.

While I agree with the majority that nothing in *Pegram II* requires a full reversal of its prior disposition, I note that other courts have been more circumspect concerning the implications of *Pegram II* in relation to conflict preemption pursuant to ERISA. *See, e.g., Corporate Health Ins., Inc. v. Texas Dep't of Ins.,* 220 F.3d 641, 643–44 (5th Cir.2000) (stating that "we do not read *Pegram* to entail that every conceivable state law claim survives preemption so long as it is based on a mixed question of eligibility and treatment, and [our own precedent] held otherwise"). Accordingly, there

S.Ct. 1671, and thus, is preempted. On the other hand, however, if a special standard of care is articulated for evaluating those decisions in which the peculiar pressures of an HMO's rationing decisions are considered, such a rule arguably regulates a plan's administration, and is also preempted. Under either scenario, ERISA invariably preempts a state law claim for medical malpractice arising out of an HMO's mixed eligibility and treatment decision. In our view, *Travelers* and *Pegram* do not contemplate such a result.

Mr. Justice Saylor files a dissenting opinion.

1. I did not participate in the decision in *Pappas I,* as it was argued prior to my induction onto this Court.

remains a division of authority regarding the appropriate construct pursuant to which ERISA preemption of laws regulating the decisions of managed care organizations should be determined,[2] although further examination of this divide is beyond the scope of our mandate on remand. I do believe, however, that two points derive from *Pegram II* that are worthy of present consideration.

First, in my view, *Pegram II* gives cause for the exercise of a degree of caution on the part of state courts and legislators in terms of defining the duties of managed care organizations (or at least those that are deemed to perform administrative functions under ERISA) for purposes of tort jurisprudence. Second, I question whether a full, fair, and final resolution of the conflict preemption inquiry can be effected unless and until some more precise definition is afforded to any duties being ascribed to U.S. Healthcare under state tort law.

Regarding the first of these points, if ERISA preemption issues can arise only in connection with a specific exercise of fiduciary duty, the majority is correct that, once U.S. Healthcare's decision is deemed to be a mixed eligibility determination,[3] *Pegram II* establishes the absence of a fiduciary duty

---

**2.** *Compare Bauman v. U.S. Healthcare, Inc.*, 193 F.3d 151 (3d Cir.1999), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2687, 147 L.Ed.2d 960 (2000); *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350 (3d Cir.1995); *Pacificare of Oklahoma v. Burrage*, 59 F.3d 151 (10th Cir.1995), *with Hull v. Fallon*, 188 F.3d 939 (8th Cir.1999), *cert. denied*, 528 U.S. 1189, 120 S.Ct. 1242, 146 L.Ed.2d 101 (2000); *Danca v. Private Health Care Systems, Inc.*, 185 F.3d 1, 5–7 (1st Cir.1999); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir.), *cert. denied*, 525 U.S. 1001, 119 S.Ct. 510, 142 L.Ed.2d 423 (1998); *Turner v. Fallon Community Health Plan*, 127 F.3d 196 (1st Cir.1997); *Jass v. Prudential Health Care Plan Inc.*, 88 F.3d 1482 (7th Cir.1996); *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir.1995); *Kuhl v. Lincoln Nat'l Health Plan*, 999 F.2d 298 (8th Cir.1993); *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321 (5th Cir.1992). Although it has been suggested that the reasoning from *Pegram II* has effectively overruled the latter line of decisions, reserving ERISA preemption exclusively for the narrow category of claims implicating pure eligibility determinations by an HMO unrelated to medical diagnosis and decision making, the assessment in the aftermath of *Pegram II* has remained mixed. *See, e.g., Corporate Health*, 220 F.3d at 643–44; *Schusteric v. United Healthcare Ins. Co.*, 2000 WL 1263581 (N.D.Ill. Sept.5, 2000).

**3.** While U.S. Healthcare has argued that its decision to deny precertification of Mr. Pappas' transfer was a pure eligibility determination, the

under ERISA, and preemption cannot apply. Certainly, however, the preemption clause itself is more broadly phrased; further, ERISA's civil enforcement provision, 29 U.S.C. § 1132, would appear to have been designed to protect the interests of plan participants more generally. Thus, while it is clear that the United States Supreme Court now subscribes to a narrower concept of preemption than that reflected in its earlier decisions, I am not so certain that the question of whether a state law claim challenges a fiduciary act is the sole, remaining, pertinent inquiry relative to preemption, particularly where the defendant may otherwise perform servicing functions integral to plan administration.

Accordingly, I would examine *Pegram II*'s analysis more broadly than merely to identify the construct which it ultimately devised to determine fiduciary status. I view as significant the Supreme Court's deliberate, measured reasoning addressing and rejecting the central conclusions of the Seventh Circuit concerning an HMO's obligations under federal law,[4] with the Court's analysis subsuming the assessment

majority's conclusion that it was in fact a "when-and-how" sort of decision within the contemplated scope of the United States Supreme Court's framing of mixed eligibility decisions, *see Pegram II*, 530 U.S. at 228, 120 S.Ct. at 2154, finds a degree of support in *Pegram*. It should be noted, however, that the decision made in *Pappas* was far closer on the continuum to the eligibility form than that which was at issue in *Pegram*, since, under U.S. Healthcare's modified-IPA-style structure, the decision was not made by the actual treating physician as was the case under the capitated arrangement at issue in *Pegram*. Indeed, arguably an IPA-style HMO's decision whether to pay for out-of-network services touches the eligibility end of the spectrum, since in relation to out-of-network providers, the HMO no longer itself functions as a service provider through its pre-arranged contracts, but rather, is relegated to a traditional fee-for-service insurance function. *See generally Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266 (3d Cir.2001)(holding that a delay-in-approval claim against U.S. Healthcare fell squarely within the realm of the HMO's administrative function).

4. The Seventh Circuit had determined that an HMO's cost control incentive system or structure could serve as the predicate for a claim of breach of fiduciary duty under ERISA. *See Herdrich v. Pegram*, 154 F.3d 362, 373 (7th Cir.1998). In so holding, the majority employed strong language that was condemnatory of various HMO practices. *See, e.g., id.* at 375 (stating that "[i]n order to minimize health care costs and fatten corporate profits for HMOs, primary care physicians

that the duty of a managed care organization as stated by the Seventh Circuit was inimical to Congressional intent in fostering the health maintenance organization paradigm. *See generally* Phyllis C. Borzi and Marc I. Machiz, *ERISA and Managed Care Plans: Key Preemption and Fiduciary Issues,* SF28 ALI–ABA 371 (ALI–ABA Course of Study Oct. 2000)(stating that "[t]he Court in *Pegram* believed it faced an irreducible challenge to the essence of managed care"). Such rejection should not be overlooked, since, although the United States Supreme Court was discussing the issue of duty according to the federal fiduciary standard embodied in ERISA, state law duties which operate similarly would be no less disruptive. Moreover, the persistence of multiple state law standards broadly affecting otherwise permissible "rationing" decisions of managed care organizations, to the extent that such entities are viewed as serving as an important tool of plan administration, would also operate contrary to a central purpose of ERISA preemption, namely, to "avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 657, 115 S.Ct. 1671, 1677–78, 131 L.Ed.2d 695 (1995). Thus, although certainly the dicta employed by the United States Supreme Court concerning preemption would appear to evidence its conclusion that ERISA may embody a degree of tolerance for some divergence among the legal standards applicable to managed care organizations across jurisdictions, *see, e.g., Pegram II,* 530 U.S. at 236–37, 120 S.Ct. at 2158,[5] such passages should not be read as completely independent of the Court's disapproval of stan-

face severe restrictions on referrals and diagnostic tests, and at the same time, must contend with ever-shrinking incomes").

5. Differing causes of action which have been asserted against managed care organizations across the nation include medical malpractice, negligence, breach of contract, breach of implied covenant of good faith and fair dealing, intentional/negligent infliction of emotional distress, wrongful death, unfair business practices, defamation, interference with contractual relations between physician and patient, antitrust violations, ostensible agency, and vicarious liability. *See* Comment, *The Ultimate Jigsaw Puzzle: ERISA Preemption and Liability in the Utilization Review Process,* 28 Cumb.L.Rev. 403, 410 (1997–1998).

dards that would penalize HMOs based solely upon their structure and/or system for doing business.[6]

As the United States Supreme Court recognized, fundamentally, managed care organizations ration treatment (or at least payment for treatment); assuming treatment is generally of positive effect, less treatment equates to greater risk (also assuming that patients cannot or will not fund treatment for which managed care will not pay);[7] and greater risk means higher incidence and more detrimental effect of injury and illness. If state law duties are imposed such that managed

6. In *Pryzbowski*, the Third Circuit recently made the above point as follows in relation to a delay-in-approval claim against an HMO:
 A holding that Pryzbowski's claims against U.S. Healthcare are not completely preempted would open the door for legal challenges to core managed care practices (e.g., the policy of favoring in-network specialists over out-of-network specialists), which the Supreme Court eschewed in *Pegram. Cf.* 120 S.Ct. at 2156–57 (rejecting claims attacking financial incentives behind HMO structure, in light of congressional policy of promoting HMOs).
 *Pryzbowski*, 245 F.3d at 274–75.
 It should be noted that *Pegram II* tied various of its conclusions to the observation that the plaintiff had not alleged physical injury in the pertinent count of her complaint. Although this factor creates a substantial distinction between the claim under consideration in *Pegram* and that at issue here, I do not believe that the Court's concerns regarding allowance of the managed care form of business are completely inapposite when considering state law duties. Significantly, the particular framing of the count at issue in *Pegram* would appear to have been a consequence of the plaintiff's attempt to state a damages claim under ERISA (notably the plaintiff's overall complaint included allegations of concrete physical injury, including peritonitis). But just as a state law negligence claim can be recast in the form of a claim under ERISA, so the form of claim that the Supreme Court rejected as a matter of ERISA fiduciary analysis can effectively be restyled as a state law claim, and it is not a difficult matter to include an allegation of proximate harm in a forum with general jurisdiction to redress such injury. Indeed, several circuit courts of appeals have viewed various efforts to craft state law causes of action in just such a manner. *See, e.g., Jass*, 88 F.3d at 1489; *Schusteric*, 2000 WL 1263581.

7. I recognize that various managed care strategies such as preventative care are designed to decrease costs by providing timely interventions which may obviate the need for more expensive treatment in the long term. Obviously, it would be ideal if such strategies sufficiently reduced the cost of health care to maintain profitability without other forms of more direct rationing. The Supreme Court's opinion seemed to accept, however, that, at least in the short term, broader forms of rationing are necessary to the managed care concept.

care organizations must provide compensation for all harm which can be proximately related to rationing, their viability will be determined by whether the cost of such harm ultimately exceeds the savings achieved by rationing in the first instance. Although certainly this is one form of risk spreading, it would not seem to be the form that Congress likely envisioned by sanctioning the managed care paradigm. Further, assuming that the managed care concept that has become integral as a service to ERISA plan administration is actually beneficial (as Congress appears to have believed), if costs ultimately exceeded savings in this particular equation, such benefit would be undermined. It would be difficult, then, to characterize state laws regulating rationing determinations which do not provide some reasonable mechanism for distinguishing between acceptable and unacceptable decisions as having only a "tenuous, remote, or peripheral connection" with covered plans, *Travelers*, 514 U.S. at 661, 115 S.Ct. at 1680, assuming that the element of plan administration extends to managed care services to ERISA plans.

This leads to my second point, namely, that before a matter of conflict preemption can be finally determined in relation to a common law duty, the state courts should define, with reasonable particularity, the pertinent duty with which the managed care organization is to be charged.[8] Here, the third-party complaint frames a cause of action for "refus[ing] to authorize transfer of husband-plaintiff to a hospital selected by physicians at Haverford Community Hospital as being able to minister to husband-plaintiff's condition." Pertinent to such claim, the majority merely indicates that the United States Supreme Court has sanctioned the application of general principles of medical malpractice to managed care organiza-

---

**8.** In contrast, when the doctrine of complete preemption is asserted pursuant to Section 502 of ERISA in order to invoke federal jurisdiction, the plaintiff's well-pleaded complaint controls, since the analysis entails a comparison between a specific, federal cause of action and one asserted under state law. *See generally Bauman*, 193 F.3d at 160. A claim of conflict preemption under Section 514, however, asserted as a defense in a state court, questions whether a state law relates to ERISA, *see id.* Therefore, it is critically important in the Section 514 context that the pertinent state law obligation at issue be reasonably identified.

tions. The result is to insulate the majority's holding that preemption is unwarranted within the United States Supreme Court's analysis from *Travelers* that "nothing in the language of [ERISA] or in the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern." *Travelers*, 514 U.S. at 661, 115 S.Ct. at 1680. It should be recognized, however, that the asserted obligation of U.S. Healthcare to telephonically precertify out-of-network care on an emergency basis as selected by Haverford Community Hospital is not easily susceptible to measurement according to the general standard of care prevailing in the medical community pertaining to the rendition of medical services. In the first instance, medical personnel are not generally obligated to pay for medical services.[9] Further, U.S. Healthcare's obligations in respect to payment arise, at least initially, from its written commitments pertaining to the provision of health care services rather than from the general nature of a physician/patient relationship; thus, while managed care coverage is frequently comprehensive and must include access to emergency treatment, an HMO may not always commit (or pre-commit) to provide full payment for any and all services rendered on precisely the terms that may be dictated by the patient, a treating physician, or circumstance.[10] Additionally, by virtue

9. The conclusions that physicians (or at least those not operating under a capitated arrangement) would not generally make decisions committing to payment responsibility finds at least colloquial support in the deposition testimony of the emergency-room physician who treated Mr. Pappas, who stated as follows:

A: My role as an emergency room physician is during an emergency to provide the best care, and I did not pay attention and did not concern myself with what would limit that care.

I was trying to provide the best care for this patient. So did I, in an emergency situation, wonder whether the insurance was one over another? No.

Q: Well, was it your understanding that whether or not a patient has coverage doesn't affect whether or not a patient is treated, it just affects who pays for it after treatment is rendered?

A. From my point of view, the medicine comes first and the paperwork will be figured out later.

10. One commentator argues this point as follows:

of a managed care organization's assumption of the role of provider of or arranger for medical services, it may in fact assume additional duties giving rise to direct or indirect claims based in tort. In this regard, however, in Pennsylvania, the determination of duty in relation to a negligence cause of action is one of law subject to the following analysis:

> [T]he legal concept of duty of care.is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society. The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship of the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Althaus v. Cohen*, 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000).[11] While suggesting the direct application of medical

> [T]here is powerful reason to recognize that a denial of funding does not *ipso facto* mean denial of care, nor is it necessarily the practice of medicine. . . .
> "[A]n adverse determination by a health insuring corporation means that the health insuring corporation will not pay for, reimburse, provide, deliver, arrange for, or otherwise make available the service in question. . . . It does not mean that the physician is precluded from providing the service or that the patient is precluded from obtaining the service from another source or through other means. . . . A physician or other provider retains authority to provide whatever services are deemed appropriate for the patient, even if the services are not included under the plan of the health insuring corporation."
>
> Morreim, *Managed Care Financial Structures*, 35 TORT & INS.L.J. at 709 (citation omitted). These comments, of course, must be read in light of constraints which may be imposed by legislative enactments and agency regulations establishing a floor for the HMO's duties, by the health care infrastructure, and by individual financial resources. The point here is only that the conclusion that full payment is always required solely upon proof of appropriateness should not be treated by courts as a foregone one.

11. As the foundation for this summary, Mr. Justice Castille quoted from the Court's prior decision in *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979), as follows:

> In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the "sum total of

malpractice principles to a non-traditional provider of insurance and medical services making mixed eligibility/treatment decisions, this Court has not undertaken the requisite duty analysis in *Pappas I* or presently. Indeed, aside from the Court's general categorization of precertification of emergency care as "intertwined with the provision of safe medical care," *Pappas I*, 555 Pa. at 351, 724 A.2d at 893, the question remains one of first impression in this Court.[12]

Thus, it can be seen that Pennsylvania's traditional construct for determining duty entails a much more precise inquiry than merely repositing such obligations within the

> those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered.... To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:
>
> These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."
>
> *Althaus*, 562 Pa. at 552–53, 756 A.2d at 1169 (quoting *Sinn*, 486 Pa. at 164, 404 A.2d at 681 (citations omitted)).

12. A proper resolution of the duty question may depend upon a myriad of factors, including the nature and incentive structure of the managed care entity; the applicable legislative and regulatory requirements for services; the specific promises made at the outset of the contractual relationship; and whether and to what extent the policy and incentive structure operate to deprive patients of the option of making an informed decision as to whether to fund services themselves. In making such inquiries, our trial courts would be advised to consider the scope of the civil enforcement provisions of ERISA, 29 U.S.C. § 1132, since, in appropriate cases, transgression into this area may lead to the assertion of federal jurisdiction under the doctrine of complete preemption. *Compare generally Corporate Health*, 215 F.3d at 537, *with Bauman*, 193 F.3d at 161–62.

rubric of "negligence laws," or "general healthcare regulation." *Pappas I,* 555 Pa. at 349, 352, 724 A.2d at 892, 894. Once fairly undertaken (and to the extent that the third-party plaintiff is asserting a duty on U.S. Healthcare's part in favor of the original plaintiff consistent with our joinder rules), the pertinent analysis should inform the conflict preemption determination (assuming, again, that something more is required than the mere identification of whether a fiduciary act was involved), with the final resolution to the question depending ultimately upon the manner in which the jury is charged on the subject.

It cannot escape notice that the above analysis, when applied to managed care organizations, necessarily entails precisely the sorts of judgments about socially acceptable medical risks that the United States Supreme Court declined to make in *Pegram II* for purposes of ERISA fiduciary analysis. *See Pegram II,* 530 U.S. at 221–22, 120 S.Ct. at 2150. It is difficult to disagree with the Supreme Court's assessment that the legislative branch presents a superior forum for the resolution of such duties, particularly in an arena as significant as managed care;[13] nevertheless, where scant guidance is presented to courts of general redress, they remain charged with the obligation to address claims according to established paradigms.[14] This is particularly the case in the health care arena, since clearly states have a fundamental interest in ensuring quality of care, and it is therefore appropriate for them to

13. In fashioning a legislative solution, Congress could also consider the existing disparity between the treatment of claims against managed care organizations providing services to ERISA plans and those that do not. *See generally* Karen A. Jordan, *Coverage Denials in ERISA Plans: Assessing The Federal Legislative Solution,* 65 Mo.L.Rev. 405, 406–07 (Spr.2000).

14. In Pennsylvania, the process of development and refinement of applicable duties as a matter of common law may be slow and cumbersome. Our trial courts, as courts of general jurisdiction, are responsible for the determination in the first instance, and cases filter through the intermediate appellate courts, with review being granted by this Court on a discretionary basis, such that the opportunity is provided for careful, informed developments. To the extent that departures from traditional forms are sanctioned, this may occur incrementally, as they will occur in the context of specific cases, rather than in the broader spectrum of the legislative process.

implement measures to assure a degree of accountability on the part of managed care organizations. However, given a legislatively sanctioned system which allows for the rationing of treatment, the interest should be balanced against the purpose of managed care organizations to avoid effectively eliminating the infrastructure designed to enhance accessibility to medical resources.[15]

Contrary to the majority's footnote 7, I make no suggestion that this Court should presently articulate the duty or standard of care applicable to U.S. Healthcare's conduct. Rather, my point is that the Court should refrain at this juncture from directing that the cause of action against U.S. Healthcare must necessarily be assessed according to medical malpractice precepts and,[16] correspondingly, resolving the preemption inquiry on such basis. I fully acknowledge that any development concerning applicable duties would necessarily occur in

---

**15.** Whether existing managed care organizations are effective in this regard is subject to differing interpretations. What is important here, however, is that Congress at least believed that there was a sufficient potential benefit to warrant express statutory authorization, *see generally Pegram II*, 530 U.S. at 232–35, 120 S.Ct. at 2156–57, and the central role which managed care occupies as a service provider to ERISA plan administration.

**16.** In its rebuttal to this dissent, the majority appears to ameliorate this difficulty by noting, "[w]hether the element of duty or the standard of care to which U.S. Healthcare should be held when third party plaintiffs attempt to prove their case differs from the duty or standard of care that Pennsylvania law imposes on non-HMO physicians is an issue that may remain for another day." However, the majority has not altered its textual assertion to the effect that "[U.S. Healthcare's decision] was a mixed eligibility and treatment decision, the adverse consequences of which, if any, are properly redressed ... through state medical malpractice law." In my view, these statements simply are not reconcilable. Moreover, the former statement appears to concede that there may be something left of the preemption inquiry, since it would be exceedingly difficult to determine whether a state-law duty is preempted unless and until the nature of such duty can be discerned.

> Thus, in answer to the final characterization provided by the majority in its footnote 7, I am not advocating that "all roads lead to preemption." My concern is, rather, the avoidance of categorical statements regarding preemption until the road which is to be taken (that is, state law duties with which the defendant is being charged) can be identified for purposes of assessing the potential for conflict with the pertinent federal statutes and interests involved.

the first instance at the common pleas level, *see supra* note 14, and would simply not foreclose any additional preemption assessment to the extent that a further consideration of duty would be appropriate in this case.

In summary, I agree with the majority that in the aftermath of *Pegram II* and *Travelers,* state laws having general application and relating to areas traditionally subject to state regulation are more likely to survive preemption challenges. I am not as certain, however, that the Supreme Court would confine the possibility of preemption solely to those cases involving pure eligibility determinations, and I believe that the reasoning of *Pegram II* contains at least inferential evidence to the contrary. In my view, *Travelers*' alteration in the course of ERISA preemption jurisprudence, which was emphasized by this Court in *Pappas I,* may evidence more than the fact of a stricter preemption construct. It may also demonstrate that the preemption inquiry may not be presently capable of distillation into questions answerable in a simple "yes" and "no" fashion. Rather, in absence of an appropriate legislative solution, the inquiry may have to endure a degree of further evolution in the law, perhaps substantial, at both the state and federal levels, particularly as it applies to an industry which occupies a societal role that touches the citizenry at large and is itself rapidly evolving.

In light of the above, I would modify this Court's original order to be without prejudice to U.S. Healthcare's ability to assert preemption arguments after such time as the trial court devises appropriate jury instructions.