J-A02016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| WILLIAM GLENN STECKMAN III | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| WALLACE SHERWOOD SCOTT | : | |
| | : | |
| | : | No. 731 MDA 2023 |

Appeal from the Order Entered April 25, 2023
In the Court of Common Pleas of York County
Civil Division at No(s): 2019-SU-002139

BEFORE: NICHOLS, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY KING, J.:                          **FILED: MAY 29, 2024**

Appellant, William Glenn Steckman III, appeals from the order entered in the York County Court of Common Pleas, which granted summary judgment in favor of Appellee, Wallace Sherwood Scott. We affirm.

The trial court opinion set forth the relevant facts and procedural history of this appeal as follows:

> The facts of this case revolve around a defamation claim first filed July 18, 2019 by former Berks County employee [Appellant] against [Appellee], former mayor of the City of Reading…. In September of 2016, [Appellant], as the Managing Director for the City of Reading, set up a committee that oversaw the bidding processes for the selection of a construction manager which would oversee construction of two new fire stations in the City of Reading. By September of 2018, after all bids were submitted, the Committee ranked the bids based upon an established criterion. [Appellant] argues he was terminated from his position thereafter because, as he claims, [Appellee] was upset that [he] had restarted the bidding process. This

statement by [Appellant] stems from the allegation that [Appellee], during the bidding process, wanted to bypass the City's established criteria and instead select the Committee's lowest ranked bidder based upon his personal belief that the lowest ranked bidder was also the lowest bidder for the job. [Appellee] denies this. After, and upon review of the lowest bid, [Appellant] alleges he determined its bid was open ended and thus noncompliant with the City's bidding requirements. [Appellee] was notified of [Appellant's] termination on or about September 18, 2018, denying any personal vendetta[1] towards him or his termination.

> [1] Rather, [Appellee] states that, in his opinion, he had a great working relationship with [Appellant] throughout the course of his employment.

After his termination with the City of Reading, [Appellant] sought and was eventually offered a position as Business Administrator for the City of York, contingent—at least in part—upon a background check. Thereafter, [Appellee] claims he was contacted through his office by an investigator from the City of York to conduct an interview as part of that background check. [Appellee] eventually met with an investigator in Reading who worked through the York City Police Department, Investigator Michael Davis, to do so. Importantly, Inspector Davis testified that he considered the meeting with [Appellee] to be some sort of official city business with the Mayor of Reading because [Appellee] was the sitting acting mayor, during normal business hours in his office, and would have direct knowledge to answer … questions. Later, [Appellee] engaged in a phone call with York City Council President, Henry Nixon, shortly after [Appellant] was introduced to York City Council but before he was considered for its business administrator position.[1] There, [Appellee] apparently indicated there was some history of personnel issues with [Appellant].

_____

[1] We will address the timing of Inspector Davis's meeting with Appellee and Appellee's phone call with Mr. Nixon in our discussion of Appellant's second issue on appeal.

[Appellant] claims that, as a result of that meeting and just before he was going to be endorsed for the position with York,[2] [Appellee] intentionally, falsely and maliciously told the York City Mayor, Michael Helfrich, and members of the York City Council that [Appellant] had engaged in bid rigging while employed by the City of Reading and that he was under investigation by the Federal Bureau of Investigation (FBI). [Appellant] further alleges those statements were made by [Appellee] in hopes the City of York would cancel its decision of employment with respect to his application. Still, [Appellant] was only told that a highly placed source from the City of Reading contacted the City of York. Additionally, Mr. Nixon had allegedly only contacted [Appellee] regarding [Appellant] based on a rumor he heard about a possible FBI investigation. Still, [Appellant] does recognize that [Appellee] did not directly acknowledge that [Appellant] was being investigated by the FBI to Inspector Davis.

> [2] [Appellant] alleges his employment was contingent upon approval by the York City Council, with a vote regarding his hiring scheduled to take place on January 2, 2019. Further, he alleges [Appellee] defamed him after becoming aware of [Appellant's] acceptance of the position **and** just before the York City Council was scheduled to vote to endorse his hiring. [Appellee] specifically denies such allegation and alleges he was never made aware as to [Appellant's] acceptance of the position with the City of York.

Ultimately, [Appellant] claims the City of York retracted its job offer because he could not get enough votes from city council to approve his job placement only after, and because of, [Appellee's] alleged informing to Mr. Nixon via phone about an FBI investigation for bid rigging. [Appellant] alleges this false information was then passed on to other City Council members, hence the denial of his hiring. Regarding the FBI investigation rumor, the FBI agent that investigates public corruption could neither confirm nor deny that there was a current FBI investigation into the City of Reading or [Appellant].

As such, [Appellant] argues that as a direct result of

- 3 -

[Appellee's] alleged publication of false and defamatory statements about him, York City Council delayed its vote to approve his employment agreement and later decided against hiring him in reliance on [Appellee's] statements. Consequently, [Appellant] asserts a claim of defamation constituting defamation *per se*, believing [Appellee's] statements falsely implicated [Appellant] in criminal activity and falsely implicated that he was the subject of a federal criminal investigation. Importantly, [Appellant] believes [Appellee's] statements were both **unsolicited** by the City of York and **made outside the scope** of his duties as Mayor (as a private citizen).[3] Further, [Appellant] asserts the statements were made with the **specific intent to sabotage his employment opportunity and reputation, without regard for the truth, and to cause financial and economic harm to him.**

> [3] [Appellant] asserts that the City of Reading maintains a policy of providing only **neutral** references for former employees and as such, [Appellee] failed to abide by that practice.

[Appellant] filed his Complaint on July 18, 2019, and [Appellee] filed Preliminary Objections on September 16. In response, [Appellant] filed an Amended Complaint on September 23, and [Appellee] answered on October 22, 2019. On December 6, 2021, [Appellee] moved for leave of [c]ourt to file an Amended Answer with Counterclaim, which the [c]ourt granted on December 2[2], 2021. [Appellee] later filed an Amended Answer with Counterclaim on January 12, 2022, and a final Case Management Order was issued.[2] Discovery ended November 21, 2022, dispositive motions were due by January 9, 2023, and [Appellee] filed

___

[2] In his counterclaim, Appellee argued that Appellant signed an "Authorization for Release of Personal Information" for the City of York to perform the background check in conjunction with Appellant's job application. (Counterclaim, filed 1/12/22, at ¶5). As part of the authorization, Appellant agreed to "indemnify and hold harmless the person to whom this request is presented … against all claims, damages, losses, and expenses…." (***Id.*** at ¶6). Thus, Appellee insisted that the authorization was designed to protect him from Appellant's lawsuit, and Appellant "should be required to indemnify [Appellee] pursuant to the Authorization." (***Id.*** at ¶10).

his Motion for Summary Judgment the following day. Subsequent briefing by the parties took place, and Oral Argument requested in this matter was held on March 27, 2023.

(Order and Opinion Granting Appellee's Summary Judgment Motion, filed 4/25/23, at 1-5) (record citations and quotation marks omitted) (emphasis in original).

By order and opinion entered April 25, 2023, the court granted summary judgment in favor of Appellee. Significantly, the court found that Appellee was a "'high public official' as acting mayor of the City of Reading when the alleged defamatory statements were made," and "absolute privilege does apply to [Appellee's] circumstances based on the specific facts of the case and the evidence presented." (**Id.** at 17). Appellant timely filed a notice of appeal on May 16, 2023.[3] On May 26, 2023, the court ordered Appellant to file a

---

[3] "Generally, this Court's jurisdiction extends only to review of final orders. A final order is defined as any order that: (1) disposes of all claims and of all parties; (2) is explicitly defined as a final order by statute; or (3) is entered as a final order pursuant to [Pa.R.A.P. 341(c)]." **McGrogan v. First Commonwealth Bank**, 74 A.3d 1063, 1075 (Pa.Super. 2013) (internal citations and quotation marks omitted). Here, the order granting summary judgment did not expressly mention Appellee's counterclaim. The court's opinion, however, specifically determined that the authorization for release of personal information applied to Appellee's comments about Appellant. (**See** Order and Opinion Granting Appellee's Summary Judgment Motion at 17-18). Moreover, the order granting summary judgment had the practical effect of rendering Appellee's counterclaim moot. **See Friia v. Friia**, 780 A.2d 664, 667 (Pa.Super. 2001) (explaining that "we must consider whether the practical ramification of the order will be to dispose of the case, making review appropriate"); **Cardinal Midstream II, LLC v. Energy Transfer LP**, 295 A.3d 284, (Pa.Super. 2023) (reiterating that "[a]n issue before a court is moot
*(Footnote Continued Next Page)*

Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Following an extension, Appellant timely filed his Rule 1925(b) statement on June 21, 2023.

Appellant now raises three issues for this Court's review:

Whether the trial court committed reversable error in granting [Appellee's] motion for summary judgment on Appellant's defamation claim when [Appellee] published the defamatory statements during an informal private unscheduled phone call from a person whom [Appellee] did not know and never met, and, pursuant to the Reading, PA Ordinances, [Appellee] was not authorized to provide information about employees?

Whether the trial court's major mistake of fact concerning the original forum in which the defamatory statements were first published by [Appellee] (*i.e.*, the trial court concluded that an in-person meeting which took place on December 31, 2018, preceded a phone conversation between Henry Nixon and [Appellee] which, based on sworn testimony, occurred prior to or on December 28, 2018, and which is when the defamatory statements concerning a possible FBI investigation of Appellant were first published) should necessitate a remand of this matter back to the trial court for reconsideration of its decision to grant summary judgment.

Whether the trial court committed reversible error or abused its discretion in determining that Appellant waived [his] claim of verbal defamation by signing an authorization for the City of York to obtain documents in furtherance of its background check, by failing to consider: (1) that City of York had superior bargaining power as his prospective employer; (2) that the sole drafting party of the authorization was the City of York; (3) that the authorization was ambiguous as to whether or not it authorized anything

_____

when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy).  Under these circumstances, we deem the instant appeal to be proper.

other than records and attorney recollections; and (4) that the authorization never specifically authorized the receipt of any verbal information?

(Appellant's Brief at 2-3).[4]

Our role in cases involving a grant of summary judgment is as follows:

> On appellate review, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Valley National Bank v. Marchiano*, 221 A.3d 1220, 1222 (Pa.Super. 2019)

(quoting *Summers v. Certainteed Corp.*, 606 Pa. 294, 307, 997 A.2d 1152,

1159 (2010)). Our scope of review is plenary. *Pappas v. Asbel*, 564 Pa.

407, 418, 768 A.2d 1089, 1095 (2001), *cert. denied*, 536 U.S. 938, 122 S.Ct.

2618, 153 L.Ed.2d 802 (2002).

In reviewing a trial court's grant of summary judgment,

> [w]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. All doubts as to the existence of a genuine issue of a material fact must be

_____

[4] We have reordered Appellant's issues for ease of disposition.

resolved against the moving party.

> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [a] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. In other words, whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense, which could be established by additional discovery or expert report and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Thus, a record that supports summary judgment either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense.

> Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions.

*Chenot v. A.P. Green Services, Inc.*, 895 A.2d 55, 61 (Pa.Super. 2006) (internal citations and quotation marks omitted).

In his first issue, Appellant acknowledges that Appellee was the mayor of Reading at the time of the alleged defamatory statements, and Appellee qualified as a high public official for purposes of analyzing the doctrine of absolute privilege. Nevertheless, Appellant contends that a high public official is not protected by absolute privilege if his remarks were: "(1) **not** made within the course of the high public official's official duties; **and** (2) **not** made within the scope of the high public official's authority." (Appellant's Brief at 15) (emphasis in original). Under this standard, Appellant asserts that Appellee was not protected by absolute privilege "when he falsely implicated

[Appellant] in an FBI investigation for bid rigging during his phone conversation with Nixon." (*Id.*)

Regarding Appellee's official duties, Appellant posits that the "impromptu" phone call between Appellee and Mr. Nixon "was about as informal as could be." (*Id.* at 16). Appellant emphasizes that the "call was a private closed conversation between the two men and was not disclosed to or made accessible to the public or other governmental officials of the City of Reading." (*Id.*) During the phone call, Appellant maintains that Appellee "was only responding to an unexpected inquiry from a stranger seeking information on a job candidate in another city—a matter that was not of public concern to the people of the City of Reading, whom [Appellee] served." (*Id.* at 18). Moreover, "[t]he conduct of [Appellee] was also not 'closely related' to the performance of his official duties because [Appellee] interfered with the pending contractual relations between [Appellant] and the City of York." (*Id.* at 22).

Regarding the scope of Appellee's authority, Appellant cites Reading's Code of Ordinances, which provides the mayor with express powers and duties. Relying on the ordinances, Appellant avers that Appellee was not authorized to provide information regarding former employees upon request. Rather, "requests for information with respect to an employee shall be made to the Managing Director for review with the City Solicitor to determine if response is appropriate." (*Id.* at 20). Appellant argues that there was no

evidence that Appellee consulted with the city's managing director prior to speaking with Mr. Nixon; therefore, Appellee acted outside the scope of his authority in speaking with Mr. Nixon about Appellant. Based upon the foregoing, Appellant concludes that this Court must reverse the order granting summary judgment in favor of Appellee and remand the matter for trial. We disagree.

Our Supreme Court has explained the doctrine of absolute privilege for high public officials as follows:

> [A]s its name implies, [the doctrine] is unlimited and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, **provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority, or as it is sometimes expressed, within his jurisdiction.**
>
> The doctrine of absolute privilege rests upon the … idea that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. This sweeping immunity is not for the benefit of high public officials, but for the benefit of the public. Absolute privilege is
>
> > designed to protect the official from the suit itself, from the expense, publicity, and danger of defending the good faith of his public actions before the jury. And yet, beyond this lies a deeper purpose, the protection of society's interest in the unfettered discussion of public business and in full public knowledge of the facts and conduct of such business.
>
> As such, absolute immunity for high public officials from civil

liability is the only legitimate means of removing any inhibition which might deprive the public of the best service of its officers and agencies. Even though the innocent may sometimes suffer irreparable harm,

> it has been found to be in the public interest and therefore sounder and wiser public policy to immunize public officials, for to permit slander, or libel … suits where the official's charges turn out to be false, would be to deter all but the most courageous or the most judgment-proof public officials from performing their official duties.

*Lindner v. Mollan*, 544 Pa. 487, 490-91, 677 A.2d 1194, 1195-96 (1996) (internal citations and quotation marks omitted) (emphasis added).

"We have previously noted that our Supreme Court has never articulated a standard for determining when a high public official's acts or statements are within the scope of his official duties." *Azar v. Ferrari*, 898 A.2d 55, 60 (Pa.Cmwlth. 2006).[5] "Nevertheless, we have identified two factors that are relevant in reaching such a determination, including (1) the formality of the forum in which the alleged defamatory words were spoken and (2) the relationship of the legitimate subject of governmental concern to the person seeking damages for the defamatory utterance." *Id.* (citing *Appel v. Township of Warwick*, 828 A.2d 469 (Pa.Cmwlth. 2003), *appeal denied*, 576 Pa. 725, 841 A.2d 532; *Hall v. Kiger*, 795 A.2d 497 (Pa.Cmwlth. 2002),

---

[5] *See also Petow v. Warehime*, 996 A.2d 1083, 1089 n.1 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 371 (2010) (stating: "This Court is not bound by decisions of the Commonwealth Court. However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate").

*appeal denied*, 572 Pa. 713, 813 A.2d 846 (2002)).

Instantly, the trial court determined that Appellee's statements fell within the scope of his official duties:

> [W]hile we do not believe [Appellee's] comments about [Appellant] were at all excessive, even if they were deemed to be so, [Appellee's] belief in an on-going investigation by the FBI about [Appellant] would render that belief closely related to a matter pending within a mayor's office. Irrespective of whether there actually was an on-going investigation at the time the City of York investigator contacted the mayor, [Appellee] was offering comments about a former employee from the information he had (*i.e.*, as mayor, he believed that the FBI had come and removed documents the day after [Appellant] left, etc.). Furthermore, even if [Appellee's] comments to the City of York may have resulted from a failure to exercise reasonable care and diligence, that fact is immaterial to the invocation of an immunity that is intended to encompass even maliciously motivated comments. Indeed, even taking [Appellant's] averments as true—that [Appellee's] comments were only that he heard or understood that there was a possible investigation by the FBI for bid rigging against [Appellant]—such statements still fall under the immunity.

> \*    \*    \*

> This matter involving [Appellant] was government business. [Appellee's] comments to the City of York investigator during normal business hours, in the mayor's office, and to the York city council president on the phone, were closely related to that government business and to what had taken place during [Appellant's] time as a former employee for the City of Reading. If allegations of bid rigging occurred, and the City of Reading terminated its employment with [Appellant], such information is of public concern as it corresponds to the suitability of a former employee for a public position in the City of York Administration. Indeed, absolute immunity is a means of removing any inhibition which might deprive the public of the best service of its officers and agencies. The doctrine of this privilege given to

- 12 -

> public officials then, is to be used as a **shield**, not as a sword.  In the current action, it is appropriately utilized as a shield by [Appellee].

(Order and Opinion Granting Appellee's Summary Judgment Motion at 14-16) (internal footnotes and quotation marks omitted) (emphasis in original).

Here, the court correctly observed that Appellee's phone call with Mr. Nixon related to governmental business.  We agree that the possibility of an investigation into bid rigging would impact Appellant's suitability for another public position, and Appellee's comments on the topic amounted to actions in furtherance of an interest of social importance.  ***See Lindner, supra***.  To the extent Appellant cites Reading's Code of Ordinances for the proposition that Appellee's comments did not occur within the scope of his official duties, we also agree with the court's determination that this conclusion "would be drawing the line of such immunity too narrowly." (Order and Opinion Granting Appellee's Summary Judgment Motion at 15).  On this record, the court did not err in applying the doctrine of absolute privilege for high public officials.  ***See Lindner, supra***.  ***See also Azar, supra*** (holding alleged defamatory statements made by intermediate school unit executive director and assistant director regarding former employee's work and health problems were made within scope of their duties and authority; former employee had solicited school districts to provide management information systems services; statements were made to school districts that were members of intermediate unit, and defendants' duties included coordination of programs offered by

intermediate unit). Accordingly, Appellant is not entitled to relief on his first claim.

In his second issue, Appellant contends that the trial court resolved "a major issue of fact against [Appellant] despite the fact that there was evidence to the contrary." (Appellant's Brief at 11). Specifically, Appellant claims that Inspector Davis "testified at his deposition that he decided to meet with [Appellee] in Reading only **after** hearing about the infamous call between [York City Council President Henry] Nixon and [Appellee] on December 28, 2018." (**Id.**) (emphasis in original). Appellant complains, however, that the court incorrectly determined that the inspector's meeting with Appellee occurred before Appellee's phone call with Mr. Nixon. Appellant maintains "that the defamation arose solely from the phone conversation in which [Appellee] engaged in with Nixon," and "[t]he forum in which [Appellee's] slanderous phone call with Nixon took place was very different from the forum for the follow-up investigation." (**Id.** at 14). Appellant concludes that the court erroneously granted summary judgment in favor of Appellee where its reasoning was "wrongly focused on the meeting with [Inspector] Davis and [Appellee] at City Hall." (**Id.** at 13). We disagree.

Considering our resolution of Appellant's first issue, we need not tarry long with Appellant's allegation that the court confused this sequence of events. Regardless of whether the meeting with Inspector Davis occurred after Appellee's phone call with Mr. Nixon, it does not alter our conclusion that

the court correctly applied the doctrine of absolute privilege for high public officials to Appellee's statements. We do not accept Appellant's assertion that the trial court committed an error of law by failing to interpret the facts in a light most favorable to Appellant as the non-moving party, and we conclude that Appellant is not entitled to relief on his second issue. **See Chenot, supra**.

In his third issue, Appellant asserts that trial court erroneously concluded that Appellant waived his claims against Appellee by signing the authorization for the release of personal information. Because we have already determined that the trial court did not err in granting summary judgment in favor of Appellee, we need not address Appellant's argument regarding the court's waiver analysis. (**See also** Trial Court Opinion, filed 7/19/23, at 2) (unnumbered) (recognizing that court's determination of validity of authorization for release of personal information was secondary to initial determination of immunity). Therefore, we conclude that the court properly granted Appellee's motion for summary judgment. **See Valley National Bank, supra**; **Chenot, supra**. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>05/29/2024</u>